894 A.2d 1158 (2006)
384 N.J. Super. 313
In the Matter of the COMMITMENT OF M.M.
Superior Court of New Jersey, Appellate Division.
Argued January 19, 2006.
Decided March 31, 2006.
*1162 Lorraine Gormley, Assistant Deputy Public Defender, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney; Ms. Gormley on the brief).
Laura J. Paffenroth argued the cause for respondent (Office of the Camden County Adjuster, attorneys; Ms. Paffenroth, on the brief).
Before Judges STERN, GRALL and MINIMAN.
The opinion of the court was delivered by
GRALL, J.A.D.
This case requires us to consider the showing necessary to establish "exceptional circumstances" and "good cause" authorizing extension of the statutory deadline for a hearing on civil commitment pursuant to R. 4:74-7(c)(1). See N.J.S.A. 30:4-27.12a. We hold that absent a request by the patient, the circumstances must be atypical, rather than routine, and reasonably unforeseen and unavoidable, rather than within the reasonable control of the state or the court. We further hold that "good cause" exists when the state's interest in extending the time for a hearing due to "exceptional circumstances" substantially outweighs the patient's interest in terminating confinement that is not supported by clear and convincing evidence of the existence of grounds for commitment.
M.M. was admitted to the Camden County Health Service Center from a crisis center on April 2, 2005.[1] A hearing on the state's application for her involuntary *1163 commitment was scheduled for and held on April 12, 2005.[2] At the conclusion of that hearing, the trial judge equivocated about the adequacy of the evidence, directed the state to subpoena M.M.'s husband, adjourned the hearing for fourteen days and continued M.M.'s commitment pending that hearing. On the return date, April 26, 2005, the judge entered an order conditionally extending M.M.'s commitment pending placement pursuant to R. 4:74-7(h)(2) without taking any testimony about her condition. She was discharged to return home on May 10, 2005.
On May 26, 2005, M.M. appealed from the April 12, 2005 order.[3] She contends that the judge erred in continuing her temporary commitment beyond the twenty-day statutory period without a sufficient showing of exceptional circumstances and good cause justifying the delay or adequate proof that she was a person in need of involuntary commitment. See N.J.S.A. 30:4-27.12a; R. 4:74-7(c)(1); N.J.S.A. 30:4-27.2m. The state argues that the judge found clear and convincing evidence of M.M.'s need for commitment and that the order reflecting an adjournment was simply not well-drafted.
We conclude that the evidence did not establish exceptional circumstances and good cause for adjournment or provide clear and convincing proof that M.M. was a person in need of involuntary commitment. Accordingly, we reverse.

I.
There were three witnesses at M.M.'s commitment hearing. Dr. Madrack, who is a psychiatrist, a social worker and M.M. testified. A summary of the evidence presented and the judge's findings and conclusions follows.
M.M. is a licensed dental technician. She also has an Associates Degree in Human Services. She had been married for approximately one year prior to her involuntary admission to a crisis center.
Dr. Madrack was "filling in" for Dr. Friedman, who treated M.M. after her admission to the facility from the crisis center on April 2, 2005. Dr. Madrack reviewed M.M.'s records, including a report prepared by Dr. Friedman on April 8.
According to Dr. Friedman's report, M.M. was admitted to the crisis center for stabilization after kicking in a basement window and throwing glass plates at her husband because she believed that he was having an affair with a super model. He noted that M.M. was chronically non-compliant with medications and follow-up. He described M.M. as "paranoid and hypervigilant," "preoccupied," "mood labile," and "lack[ing in] insight into her illness." His diagnosis was "Axis I: 1) Bipolar I disorder; manic õ psychoses 2) ETOH Abuse"; "Axis II: Deferred"; "Axis III: Amennorhea (sic)." He concluded that M.M. was dangerous to others, property and herself. He recommended hospitalization for a period of ninety days.
*1164 Dr. Madrack claimed to have seen M.M. twice during her hospitalization, for approximately twenty minutes on each occasion. She described a meeting on the Friday prior to the April 12 hearing, which would have been April 8, and a meeting on April 11 at which she just reminded M.M. about the hearing.
In Dr. Madrack's opinion, M.M. suffered from bipolar disorder and posed a danger to others and property. Her recitation of the basis for that opinion tracked Dr. Friedman's report:
The patient was originally brought in by the police after she kicked in a basement window at her home. This all stems from the fact that she believes that her husband is having an affair with a super model. She also ha[d] been damaging other proper[ty] at the home at that time by throwing dishes and glass plates at her husband and breaking objects in the house. And, there has been a period that she has for a long time been noncompliant with her medications, and she also displays other delusions at this time.
Like Dr. Friedman, Dr. Madrack concluded that M.M. had "little insight into what she had done" prior to her admission "with regard to destruction of property and throwing objects at" her husband. Dr. Madrack admitted, however, that her information about M.M.'s pre-admission conduct was derived solely from her review of M.M.'s records. She explained that because M.M. had been taken to the crisis center by the police, she assumed that the officers provided some of the information. She did not know whether the police had observed the events, and she reported that M.M. had neither admitted nor denied the conduct during their meetings. None of the reports upon which Dr. Madrack relied were admitted into evidence. When Dr. Madrack saw M.M. on April 8, M.M. was angry and upset with her husband, believed he was having an affair, had thoughts about wanting to get even with him, said he would deserve whatever he got and that she wanted to go home with him.
M.M. testified about her pre-admission conduct. She denied kicking in the basement window and said she may have broken it accidentally while trying to cover her husband's car with a tarp. She also denied throwing or purposely breaking any dishes and explained that her husband sometimes drinks too much and that they sometimes have "spat[s] ... like most people do when they're newlyweds." She admitted that she let a teacup saucer drop on the table during one of those spats and suggested that her husband might have thought that she was aiming at him.
Dr. Madrack described M.M.'s progress and current condition as follows:
While she has been here she has made minimal progress. The only progress that I could see was the fact that she has not destroyed any property in here at the hospital, but, besides that, she has been []very labile, very focused on her husband, making statements that she wants to tell her husband to take her home. She has continued to display the same paranoid delusions that ... presented her here.
Dr. Madrack explained that M.M.'s delusions were her belief that she was pregnant and her belief that her husband was having an affair. She reported that M.M. continued to believe that she was pregnant even after she was told that a pregnancy test was negative. Dr. Madrack did not discuss, however, Dr. Friedman's diagnosis of Amenorrhea. She did not ask M.M. about whether she and her husband were attempting to conceive a child, and she did not explain why she concluded that M.M.'s *1165 belief about her husband's affair was delusional.
A psychiatric nurse practitioner who evaluated M.M.'s status on April 11 reported that M.M. was alert and neither disoriented nor delusional. Although Dr. Madrack admitted she had not assessed M.M.'s condition on April 11, she dismissed the nurse's report. According to Dr. Madrack, because the nurse had not evaluated M.M. in the past, she may not have been aware of or talked to M.M. about the delusions.
At the hearing M.M. denied any present delusions. She said she knew she was not pregnant and did not suspect her husband of infidelity. She said she would continue her medications.
In Dr. Madrack's opinion, M.M.'s delusional beliefs were likely caused by her non-compliance with her medication schedule. She had not contacted M.M.'s doctor to determine whether he had discontinued her medication and did not know whether M.M. had ever been hospitalized in the past. She reported that M.M. had been taking her medication at the hospital. Dr. Madrack was not asked and did not offer an opinion as to whether the improvements in M.M.'s condition reported by the nurse practitioner were attributable to M.M.'s renewed compliance with her medication schedule. She did not comment on M.M.'s promise to continue her medication following release.
The social worker assigned to M.M.'s case did not know where M.M.'s husband stood with respect to her return to the marital residence. He noted that the husband had not sought a restraining order and was ambivalent about M.M.'s return, saying he was "afraid of her coming home" but also saying "he guessed she could come home."
M.M. asked the judge to discharge her. Although she wanted to return home, she said she would move in with her mother if not permitted to go to her own home.
M.M.'s attorney asked the court to place her on conditional extension pending placement (CEPP). In the attorney's view, CEPP status would permit a determination as to whether M.M. would return home or make other arrangements.
The judge found:
It doesn't seem like there [has] been any violent behavior since [M.M.] has been in the hospital. I understand ... that [M.M.] has indicated to Dr. Madrack and others ... facts that are not correct about being pregnant, about her husband having an affair with a super model, that would of course not be enough in and of itself ... for continued commitment, but what the court observed, and these are business records thatthat there was some damage of property ... and there may have been assaultive behavior by [M.M.] at that point in time. I don't want to be dismissive of that. I would like to adjourn this hearing at this time, reschedule for two weeks and have [M.M.'s husband] subpoenaed to be here.
M.M.'s attorney argued that the state had not proven dangerousness by clear and convincing evidence. The judge said:
I understand these are all business records, and we cannot admit them as to the truth of the event of throwing dishes, kicking out windows, assaultive behavior, but there's just no way that we can function bringing all these potential witnesses here every day.
....
... There's no way that the court can believe that there was a police report that said she was throwing dishes if, in fact, she dropped a saucer in the basement *1166 and the saucer may have cracked, that is not credible.
The judge ultimately concluded that a two-week continuation of confinement was appropriate and not objectionable, stating:
There is no difference in the time of this person being deprived of her liberty whether I adjourn this matter for two weeks to allow [M.M.'s husband] to be subpoenaed and to be here and if we  if I order CEPP today and we bring her back  bring them  everybody back two weeks from now as to the condition. It's exactly the same two weeks.
. . . .
I think the State has proven its case at this juncture, however I'm willing before we order a 90-day commitment [to] listen to [M.M.'s husband]. That's all. I'm not going to order that every witness in every case be produced....
Without further explanation or discussion, the judge entered an order adjourning the hearing for two weeks over the objection of M.M.'s attorney.
On the return date, no additional evidence was presented about the events that led up to M.M.'s commitment, her current mental status or her dangerousness.[4] Although M.M.'s husband and her brother were present, they were not questioned about anything other than their willingness to take M.M. home with them. M.M.'s husband responded, "Not at this time, no. I've got so many other things to do." M.M.'s brother explained why he believed his mother's home was not a good placement at that time. As noted above, M.M. was placed on CEPP and subsequently discharged to return home.

II.
We first consider whether the judge erred in extending M.M.'s temporary commitment hearing beyond the statutory period. Pursuant to N.J.S.A. 30:4-27.12a, "[a] patient who is involuntarily committed to a short-term care or psychiatric facility or special psychiatric hospital [must] receive a court hearing with respect to the issue of continuing need for involuntary commitment within 20 days from initial inpatient admission to the facility." Rule 4:74-7(c)(1) permits delay of a hearing beyond that deadline only "in exceptional circumstances and for good cause shown." In this case, the statutory period expired on April 22, 2005, and the adjournment ordered by the trial judge extended the period until April 26, 2005.
In determining whether particular circumstances warrant relaxation of a statutory deadline or procedural rule, our courts generally consider the purpose of the requirement at issue and the public and individual interests implicated by a decision to enforce or relax it. See, e.g., Hartsfield v. Fantini, 149 N.J. 611, 615, 695 A.2d 259 (1997) (considering relief from the thirty-day deadline for requesting trial de novo following arbitration); Rivers v. LSC P'ship, 378 N.J.Super. 68, 78, 874 A.2d 597 (App.Div.) (considering "exceptional circumstances" warranting extension of discovery pursuant to R. 4:24-1(c)), certif. denied, 185 N.J. 296, 884 A.2d 1266 (2005); see also Housing Auth. of Morristown v. Little, 135 N.J. 274, 289-90, 639 A.2d 286 (1994) (balancing interest in finality of judgments and the parties' competing interests in considering "exceptional circumstances" warranting relief from judgment pursuant to R. 4:50-1(f)). Courts of other states have taken a similar *1167 approach in identifying circumstances that warrant extension of a deadline for a civil commitment hearing. In re Kirby, 65 Wash.App. 862, 829 P.2d 1139, 1142 (1992) (quoting In re Schuoler, 106 Wash.2d 500, 723 P.2d 1103 (1986) and concluding the question requires comparison of the "public and private interests" and the "weight of the reasons for and against" extension).
The purpose of the twenty-day statutory period is to afford a prompt hearing on the question whether the individual's commitment is warranted. "[I]nvoluntary commitment ... is a profound and dramatic curtailment of a person's liberty. ..." In re Commitment of D.M., 285 N.J.Super. 481, 486, 667 A.2d 385 (App. Div.1995), certif. denied, 144 N.J. 377, 676 A.2d 1092 (1996); see Addington v. Texas, 441 U.S. 418, 426, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323, 331 (1979). This interference with individual liberty is justified by the state's interest in confining and treating "an individual [who] is likely to pose a danger to self or others or property by reason of mental illness." In re Commitment of S.L., 94 N.J. 128, 138, 462 A.2d 1252 (1983). Because the patient's liberty is at stake, "meticulous adherence to statutory and `constitutional criteria'" is required. D.M., supra, 285 N.J.Super. at 486, 667 A.2d 385.
The criteria impose procedural and substantive limitations on the state's commitment authority. The statutory law, N.J.S.A. 30:4-27.1 to -27.23, is the result of the Legislature's effort to "balance[ ] the basic value of liberty with the need for safety and treatment...." N.J.S.A. 30:4-27.1b. The Legislature's express goal was to "provide clear standards and procedural safeguards that ensure that only those persons who are dangerous to themselves, to others or to property, are involuntarily committed." Ibid.
While the law permits temporary commitment prior to a hearing on the basis of probable cause to believe that a person is in need of involuntary commitment, it also recognizes that it is exceptional to deprive a person of liberty prior to a hearing on the need for such extraordinary restraint. See R. 4:74-7(c); N.J.S.A. 30:4-27.10f, g, h. Our cases recognize that this pre-hearing confinement is justified only because of the urgency of the threat of serious harm to person, property or self posed by the patient. In re Commitment of B.L., 346 N.J.Super. 285, 304, 787 A.2d 928 (App.Div.2002); In re Commitments of M.G. & D.C., 331 N.J.Super. 365, 380, 751 A.2d 1101 (App.Div.2000). The twenty-day period for pre-hearing deprivation of liberty is deemed constitutionally reasonable because of the urgency at its inception and in order to permit time for preparations essential to a fair and meaningful hearing. Coll v. Hyland, 411 F.Supp. 905, 907, 910-11 (D.N.J.1976) (per curiam opinion of three-judge statutory court considering challenge to New Jersey law). Those essential preparations include testing and observation adequate to permit a diagnosis, notice to the patient, assignment of counsel, opportunity to prepare the case and court scheduling. Id. at 911; accord Briggs v. Arafeh, 411 U.S. 911, 93 S.Ct. 1556, 36 L.Ed.2d 304 (1973) (summarily affirming Logan v. Arafeh, 346 F.Supp. 1265, 1269 (D.Conn.1972), which held that a forty-five-day period was not unreasonable when the purposes of examination and preparation were considered). Our statutes require all these pre-hearing steps to ensure a reliable and fair proceeding at which the substantive criteria for commitment must be proven by clear and convincing evidence at or before the end of the twenty-day period. N.J.S.A. 30:4-27.11, -27.13, -27.14, -27.15.
*1168 The justifications for temporary commitment prior to a hearing permit several conclusions relevant to the question of circumstances that should be deemed "exceptional" and the "good cause" that should be deemed adequate to extend the statutory period for pre-hearing confinement. The Legislature intended to establish a clear and certain time frame. The primary purpose of this clear standard is protection of the patient's interest in a prompt determination. A secondary purpose is providing a time period sufficient to permit preparation essential to a fair hearing with a reliable outcome. In effect, the twenty-day rule gives the patient a right to expect a hearing within twenty days and the state an obligation to provide it. See Hashimi v. Kalil, 388 Mass. 607, 446 N.E.2d 1387, 1389-90 (1983) (concluding "[t]hat the statute imposes a restraint on liberty [] compels the conclusion that the time limit ... goes to the essence of the public duty").
On the basis of the forgoing, we hold that trial courts must take a narrow view of the circumstances that qualify as "exceptional" and establish "good cause" for extension. A broad reading permitting routine and numerous exceptions would undermine the intended clarity of the standard. N.J.S.A. 30:4-27.1b; see State v. Goode, 830 So.2d 817, 824 (Fla.2002) (noting that a broad reading of permissible exceptions to Florida's statutory period would render the standard meaningless).
Because the twenty-day period primarily protects the patient's liberty interest, a patient's request for extension should be viewed with liberality. A judge may presume, subject to rebuttal, that a patient's request is based on an "exceptional circumstance." In contrast, circumstances justifying an extension over the patient's objection should be atypical, rather than routine, and unforeseeable and unavoidable, rather than reasonably avoidable through the exercise of due diligence. Kirby, supra, 829 P.2d at 1142; see Rivers, supra, 378 N.J.Super. at 78-79, 874 A.2d 597 (concluding that exceptional circumstances must be "unusual" and beyond the control of the party requesting relief). For example, an emergency closure of the courthouse or unavoidable and unexpected absence of a treating psychiatrist scheduled to testify could qualify as exceptional.
A finding of "good cause" must be based on the conclusion that the patient's significant interest in a prompt hearing is substantially outweighed by the state's interest in extension of the pre-hearing deprivation due to the exceptional circumstance. Fourteen days is the maximum not the automatic duration of the extension authorized by R. 4:74-7(c)(1). Thus, the duration of the extension must be reasonably attributable to the exceptional circumstance and the need to address it. For example, an exceptional circumstance such as the closing of the courthouse would establish good cause for an extension limited in duration by the time essential to address the emergency closure. Similarly, even when the patient requests an adjournment, the delay should be no longer than required to accommodate the exceptional circumstance.
"Good cause" also must be assessed in light of relevance to the outcome of the proceeding. For example, where the medical evidence is inadequate to establish mental illness within the meaning of the statute, an exceptional circumstance precluding presentation of testimony about dangerousness would not establish good cause, because the state has no legitimate interest in committing a person on the basis of dangerousness alone. Thus, the need to find "good cause" requires a judge to consider whether there is a legitimate *1169 basis for continuing confinement in order to address the exceptional circumstance.
As in other instances in which courts are authorized to relax statutory time frames and rules of litigation, the inquiry is fact-specific and must be left to the sound exercise of the trial judge's discretion in light of the standards enunciated here. Hartsfield, supra, 149 N.J. at 618, 695 A.2d 259; Housing Auth. of Morristown, supra, 135 N.J. at 286, 639 A.2d 286. Such discretionary determinations will be given deference and reviewed for abuse of discretion. Rivers, supra, 378 N.J.Super. at 80, 874 A.2d 597.
The narrow scope of appellate review is not the equivalent of a grant of unbridled discretion or a license to avoid meticulous fact-finding in light of the controlling legal standards. "Our cases have repeatedly indicated the importance of such findings and conclusions to assure informed appellate review." Rosenberg v. Bunce, 214 N.J.Super. 300, 303, 518 A.2d 1134 (App. Div.1986). As the Supreme Court and this court have stressed, a court's failure "to perform this essential duty `constitutes a disservice to the litigants, the attorneys and the appellate court.'" Klajman v. Fair Lawn Estates, 292 N.J.Super. 54, 61, 678 A.2d 289 (App.Div.) (quoting Curtis v. Finneran, 83 N.J. 563, 569-70, 417 A.2d 15 (1980)), certif. denied, 146 N.J. 569, 683 A.2d 1164 (1996). Omission of this duty is particularly problematic where the decision is discretionary; without findings relevant to the legal standards the litigants and the reviewing court "can only speculate about the reasons" for the decision. Rosenberg, supra, 214 N.J.Super. at 304, 518 A.2d 1134.
The importance of the individual and public interests implicated by civil commitment "demonstrate the particular necessity... for the trial judge to comply assiduously with the mandate of ... [the] myriad [of] cases pointing out the importance of findings." In re Commitment of S.D., 212 N.J.Super. 211, 218-19, 514 A.2d 844 (App. Div.1986). A judge presiding over a commitment hearing is vested with extraordinary responsibility; when the judge does not apply the legal standards and find the relevant facts, our subsequent correction of the abuse of discretion is a poor remedy for the ill.
In this case, the judge did not even consider whether there were exceptional circumstances and good cause warranting extensions of the statutory period. Such a failure to consider the legal standards is an abuse of discretion. In the interest of judicial economy and because of M.M.'s discharge, we decline to remand for a statement explaining the decision. See Rosenberg, supra, 214 N.J.Super. at 304, 518 A.2d 1134.
A fair reading of the decision below is that the judge extended M.M.'s pre-determination confinement because he was not clearly convinced that the evidence of her need for commitment was adequate. There simply was no evidence of an atypical, unavoidable circumstance precluding presentation of adequate proof. The judge's suggestion that failure to present essential testimony warrants extension of pre-determination confinement is without legal foundation and troubling. To the extent the state's obligation to produce witnesses is burdensome, it is a burden that is imposed by the Constitution. M.G., supra, 331 N.J.Super. at 385, 751 A.2d 1101.
With respect to good cause, the judge gave little consideration to the patient's interest and did not even consider the possibility of the state's securing the witness he deemed critical within the statutory period. The omission is not easily understood in the context of this case; *1170 M.M.'s social worker, who had been in contact with the witness, was present. Without any inquiry into the time needed to address the exceptional circumstances, a judge cannot conclude that there is good cause for the delay he or she authorizes.
We do not suggest that a witness of the sort the trial judge deemed necessary here will be essential in every case, or even most cases. Most frequently witnesses other than a treating psychiatrist are not necessary. That is so because police, screening center or hospital reports often indicate that the author has recorded his or her observations of the patient's relevant behavior in the course of performing his or her duties. Such reports are admissible. N.J.R.E. 803(c)(6). To the extent that such reports include statements made by the patient for purposes of treatment or in explaining his or her present state of mind, they are also admissible for the truth of those statements. N.J.R.E. 803(c)(4); N.J.R.E. 803(c)(3); N.J.R.E. 805. With preparation, counsel should be able to identify and obtain witnesses for those rare cases in which there is inadequate competent evidence of dangerousness included in admissible reports.

III.
As an alternate basis for affirmance, the state argues that it presented clear and convincing evidence that M.M. was a person in need of commitment. Our review convinces us that the evidence did not establish M.M.'s mental illness or dangerousness by that standard. Equivocal proofs are not sufficient. In re Commitment of W.H., 324 N.J.Super. 519, 523, 736 A.2d 529 (App.Div.1999). The evidence must permit the judge "to come to a clear conviction [that person is mentally ill and dangerous], without hesitancy." In re Commitment of G.G.N., 372 N.J.Super. 42, 59, 855 A.2d 569 (App.Div.2004); see P.D., supra, 381 N.J.Super. at 394, 886 A.2d 208; In re D.C., 146 N.J. 31, 60-61, 679 A.2d 634 (1996).
While this court gives deference to civil commitment decisions and reverses only when there is clear error or mistake, a reviewing court must consider the adequacy of the evidence. D.C., supra, 146 N.J. at 58-59, 679 A.2d 634; see Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 (1974). To be adequate, the evidence must be competent. Rova Farms Resort, supra, 65 N.J. at 484, 323 A.2d 495.
A judge may assign to expert testimony only the weight to which it is entitled given its foundation. Balsamides v. Protameen Chems. Inc., 160 N.J. 352, 368, 734 A.2d 721 (1999) (discussing importance of trial judge's fact-finding in evaluating expert testimony and deference to be given to the trial judge's determinations). For that reason, the judge must consider whether the opinion is based on evidence of the sort upon which experts in the particular field reasonably rely. N.J.R.E. 703; see In re Commitment of J.H.M., 367 N.J.Super. 599, 612-14, 845 A.2d 139 (App.Div.2003), certif. denied, 179 N.J. 312, 845 A.2d 137 (2004). A judge must be given enough information to conclude that the expert is not simply repeating diagnoses and opinions of other experts. See In re Commitment of E.S.T., 371 N.J.Super. 562, 575, 854 A.2d 936 (App.Div.2004). And, because a judge must discount expert opinion to the extent that it is based on facts and assumptions not established or inferable from admissible evidence, the expert must identify and the judge must consider the source of the information underlying the opinion. See B.L., supra, 346 N.J.Super. at 306-07, 787 A.2d 928; State v. Farthing, 331 N.J.Super. 58, 78, 751 A.2d 123 (App.Div.), certif. denied, 165 N.J. 530, 760 A.2d 784 (2000); *1171 In re Commitment of J.B., 295 N.J.Super. 75, 78-79, 684 A.2d 925 (App.Div.1996). Moreover, a judge must take care to avoid any use of an expert's testimony about the foundation for an opinion as proof of facts that are neither derived from nor established by otherwise admissible evidence. J.H.M., supra, 367 N.J.Super. at 612-14, 845 A.2d 139.
Considered in light of the foregoing basic rules that have been well-explained in a host of decisions, the expert testimony about M.M.'s dangerousness and delusion had no probative value. The "delusion" critical to Dr. Madrack's concern about M.M.'s anger and conduct was M.M.'s belief that her husband was having an affair, a belief the psychiatrist apparently deemed irrational and evidential of a substantial disturbance of M.M.'s perception of reality. N.J.S.A. 30:4-27.2r; see Farthing, supra, 331 N.J.Super. at 77, 751 A.2d 123. But the psychiatrist and the judge apparently failed to appreciate that any conclusion about the irrationality of that belief was dependent upon real world circumstances that were never established. See id. at 77-78, 751 A.2d 123.
While the conclusion that a delusion is at work is reasonably inferred when a person believes he is "the Napoleon," the same inference is not available when based on a person's belief that his or her spouse is having an affair with a super model. See Farthing, supra, 331 N.J.Super. at 77, 751 A.2d 123; Lodge v. State, 597 S.W.2d 773, 778 (Tex.Civ.App.) (discussing lack of foundation for the expert's opinion that the patient's belief that her daughter was "mistreating" her grandson was delusional), aff'd on other grounds, State v. Lodge, 608 S.W.2d 910 (1980). While it is not inconceivable that an expert could conclude that a belief of this sort is delusional based on an irrational explanation provided by the patient, Dr. Madrack offered no such explanation. Thus, the only foundation for the judge's conclusion that M.M. had told "Dr. Madrack facts that are not correct ... about her husband having an affair with a super model," was M.M.'s testimony at the hearing acknowledging that she did not presently question her husband's fidelity. There was no foundation for Dr. Madrack's opinion that by reason of a delusional belief M.M. was dangerous; M.M., who provided the only competent proof that the belief was delusional, no longer entertained the belief.
Dr. Madrack's opinion about M.M.'s dangerousness was similarly based on facts not established by competent admissible evidence. Dr. Madrack had no idea of the source of the information provided to the screening center about M.M.'s pre-admission conduct. See State v. Alston, 312 N.J.Super. 102, 113, 711 A.2d 363 (App.Div.1998). Thus, there was no cause for the judge's concern that M.M. had engaged in assaultive behavior because there was no competent evidence that she had. The only admissible evidence provided by Dr. Madrack was that M.M. had engaged in no destructive conduct since her admission to the facility. Although the judge did not credit M.M.'s testimony about the dishes and the window, he rightly equivocated about the adequacy of that testimony to support a finding of dangerousness by reason of mental illness as those terms are defined.
A person is in need of involuntary commitment when there is clear and convincing evidence of the following: (1) the person is mentally ill, as that term is defined in N.J.S.A. 30:4-27.2r; (2) the mental illness causes the person to be dangerous (a) to self or (b) to others or property, as those terms are defined in N.J.S.A. 30:4-27.2h, i; (3) the person is unwilling to be admitted to a facility for voluntary care; and (4) the patient needs care at a psychiatric *1172 facility or hospital because other available services will not meet the patient's needs. N.J.S.A. 30:4-27.2m; see P.D., supra, 381 N.J.Super. at 394, 886 A.2d 208; D.M., supra, 285 N.J.Super. at 489-90, 667 A.2d 385; R. 4:74-7(f)(1).
The relevant terms are statutorily defined. The term "mental illness" means:
[A] current, substantial disturbance of thought, mood, perception or orientation which significantly impairs judgment, capacity to control behavior or capacity to recognize reality.... The term mental illness is not limited to "psychosis" or "active psychosis," but shall include all conditions that result in the severity of impairment described herein.
[N.J.S.A. 30:4-27.2r.]
The term dangerous to others or property means:
[T]hat by reason of mental illness there is a substantial likelihood that the person will inflict serious bodily harm upon another person or cause serious property damage within the reasonably foreseeable future. This determination shall take into account a person's history, recent behavior and any recent act or threat.
[N.J.S.A. 30:4-27.2i.]
As these statutes clearly provide, medical labels are not determinative of the existence of a qualifying "mental illness" or dangerousness; a functional analysis of the patient's condition under "the standards plainly articulated in the relevant statutes" is required. D.M., supra, 313 N.J.Super. at 456, 712 A.2d 1277. The definitions call for a legal judgment guided by medical expert testimony. D.C., supra, 146 N.J. at 59, 679 A.2d 634; D.M., supra, 313 N.J.Super. at 456, 712 A.2d 1277. The judge must make specific findings and correlate them to the legal standards. D.M., supra, 313 N.J.Super. at 454, 712 A.2d 1277.
There was no evidence of current "mental illness" requiring care at the facility. R. 4:74-7f(1), (4). At best the evidence supported a finding that M.M. was experiencing "a current, substantial disturbance of thought, mood, perception or orientation which significantly impair[ed her] judgment, capacity to control behavior or capacity to recognize reality" at the time of her admission. N.J.S.A. 30:4-27.2r. By the time of the hearing, M.M.'s testimony and condition established that, consistent with Dr. Madrack's view, any delusion was a product of her failure to take her medication and had been eliminated. See W.H., supra, 324 N.J.Super. at 524, 736 A.2d 529. Having resumed and agreed to continue her medication, M.M. was no longer suffering from a current disturbance or in need of treatment services available only at the facility. N.J.S.A. 30:4-27.2m, r; R. 4:74-7f(1), (4).
There was also insufficient competent evidence to permit a finding of a "substantial likelihood that [M.M. would] inflict serious bodily harm upon another person or cause serious property damage within the reasonably foreseeable future." N.J.S.A. 30:4-27.2i. Nothing established that she had done anything of that sort prior to her admission, and competent evidence demonstrated that she had done nothing remarkable since her hospitalization. Ibid. If Dr. Madrack had reason to believe that M.M.'s statement about wanting to get even with her husband was indicative of an intention or inclination to engage in violent conduct, she did not give any testimony that would allow the judge to draw that inference. Cf. N.J.S.A. 30:4-27.2i (recent threats). If the judge observed something that allowed him to conclude that M.M. posed such a danger, he did not make that finding.
*1173 For all of these reasons, we reject the state's alternative argument in support of affirming the decision to confine M.M. beyond the statutory period for commitment on the basis of probable cause. Our conclusion is based on the absence of evidence and consistent with the equivocation of the judge who had the opportunity to observe the witnesses.
Reversed.
NOTES
[1] The parties have not provided an order memorializing a judicial finding of probable cause for M.M.'s temporary commitment and setting the hearing date. See R. 4:74-7(c)(1); N.J.S.A. 30:4-27.10f, g, h. Because M.M. does not allege a deprivation of rights prior to the hearing, we assume entry of the requisite order.
[2] The transcript erroneously denotes April 14, 2005, as the hearing date. There is no dispute that the hearing was held on April 12, 2005.
[3] Because M.M. was temporarily committed on April 2, 2005, and less than one year has passed, this appeal is not moot. This commitment remains relevant in the event of future placements. See N.J.S.A. 30:4-27.5b; In re Commitment of P.D., 381 N.J.Super. 389, 393 n. 2, 886 A.2d 208 (App.Div.2005), certif. granted and remanded, 186 N.J. 251, 893 A.2d 719 (2006). Further, regardless of potential future consequences, the issue raised is one of public importance that is likely to recur in cases that will be mooted before adjudication. In re Commitment of N.N., 146 N.J. 112, 124, 679 A.2d 1174 (1996).
[4] The transcript of this proceeding was provided following oral argument on this appeal and without objection.