# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5605-15T4

IN THE MATTER OF THE
COMMITMENT OF S.S.

_____

Argued January 16, 2018 — Decided August 1, 2018

Before Judges Accurso and Vernoia.

On appeal from Superior Court of New Jersey,
Law Division, Cumberland County, Docket No.
CUCC000210165215.

Lorraine Gormley Devine, Assistant Deputy
Public Defender, argued the cause for
appellant S.S. (Joseph E. Krakora, Public
Defender, attorney; Lorraine Gormley Devine,
of counsel and on the brief).

Anne E. Walters, Assistant County Counsel,
argued the cause for respondent State of New
Jersey (Christopher A. Orlando, Camden
County Counsel, attorney; Emeshe Arzón,
Assistant County Counsel, on the brief).

PER CURIAM

S.S. appeals from a June 28, 2016 order continuing her

involuntary civil commitment pursuant to R. 4:74-7.[1]  She argues

_____

[1]  Although S.S. was transferred to Ancora Psychiatric Hospital
and placed on CEPP (conditional extension pending placement)

(continued)

the State failed to prove by clear and convincing evidence that she was in continued need of involuntary commitment pursuant to N.J.S.A. 30:4-27.1 to -27.23 and R. 4:74-7. We agree and reverse.

S.S. had been involuntarily committed at Northbrook Behavioral Health Center for twenty-six days at the time of the review hearing. Before her transfer to Northbrook, she spent two weeks at Bridgeton Hospital, precipitated by a report of aggressive behavior at the shelter where she had been resident for six weeks. It was her fifth commitment within a year's time.

There was discussion on the record among counsel, S.S.'s social worker and the court at the start of the hearing about a domestic violence restraining order against S.S., apparently obtained by her brother. S.S. lived with her brother and their grandmother before going to the shelter. The social worker explained she had been unable to obtain the order and it was not produced at the hearing. None of the participants had seen it and there was no indication of whether it was a temporary or

(continued)
status following the review hearing on July 12, 2016, we do not consider the matter moot in light of the importance of S.S.'s liberty interest and the likely repetition of error escaping review. See In re Commitment of N.N., 146 N.J. 112, 124 (1996).

A-5605-15T4

final order. Addressing the issue as it related to her client's placement, counsel for S.S. stated S.S. was not seeking discharge to her family but requesting CEPP status.

S.S.'s treating psychiatrist was not available for the review hearing. Instead, another psychiatrist met briefly with S.S. five days before the hearing and testified for the State. The doctor explained S.S. suffered from a mental illness, schizoaffective disorder, remained on close supervision, and was a danger to herself and others. He claimed the danger to herself was that she refused to permit staff to check her "vitals" on one or two occasions, even though she had been diagnosed with hypertension. The psychiatrist opined she was a danger to others because of "the admit reasons" and an oral report he received about an "outburst" that morning "in which she accused an R.N. of husband stealing and threatened to break out . . . all the windows in the unit, apparently." He recommended S.S. remain committed, "act in a less labile manner and continue to improve and take medications."

The psychiatrist admitted on cross-examination he could not recall very much about his interview with S.S., acknowledged he had no concern for suicide, and confirmed S.S. was faithfully taking all prescribed medications, including that prescribed for hypertension. He did not know whether her blood pressure was

within normal limits. Asked whether there had been other incidents similar to the one he reported that morning, which he acknowledged he did not witness, he replied "[w]ith that many patients, I can't review every single note." He admitted he was "not aware of any specific harmful action" taken by S.S and did not know the source of the allegations prompting S.S.'s admission to the hospital, which he referred to as "the admit reasons."

S.S. testified she entered the hospital after the shelter told her she had exceeded her allotted time there and her grandmother was not available to pick her up. She denied being aggressive to anyone, and claimed she called the hospital for assistance when she felt herself getting upset. She testified she had not refused vitals, was compliant with her medication and would continue so upon her release.

S.S. also testified her grandmother visited her when she was in the hospital. When the judge attempted to explain the "no contact" provision in a domestic violence restraining order would prevent her from returning to her grandmother's home, S.S. replied that she and her "grandmom, like, we're very close. She raised me as her daughter." Although acknowledging "that paper," S.S. explained that "after a while, my grandmother is going to come see me to see if I'm okay."

S.S.'s social worker testified she had not seen S.S.'s outburst that morning because it occurred prior to the start of her shift, but that it "was reported to [her]" as part of the morning report. The court overruled counsel's objection that an oral report could not qualify as a business record exception to the hearsay rule. The social worker further testified, again over objection, that she had taken S.S. the day before to Parkwoods Residential Health Care Facility, but staff there told her they refused to even permit S.S. to tour the facility after "she told him how she knocked out all the windows" in her grandmother's home. The court rejected counsel's hearsay objection, explaining the witness was "testifying [to] what your client said to somebody else. That's an exception to the hearsay rule." Based on the experience with Parkwoods, the social worker testified that S.S. was not even "ready to be discharged to a residential healthcare facility."

When the social worker began to testify about her conversations with S.S.'s grandmother, the judge sustained counsel's objection, but said he would "draw adverse inferences from that." When counsel objected to the court drawing an adverse inference from a well-grounded hearsay objection, the judge explained "your client was telling me what a great

relationship she has with her grandmother. At this point, I have to assume that that's not correct."

After hearing the testimony and the argument of counsel, the court continued S.S.'s commitment. Although acknowledging that he was not aware whether the domestic violence restraining order was "a TRO or an FRO," what the predicate facts were or when the incident occurred, other than some time in 2016, the judge found "there is an order indicating that there has been dangerous behavior with respect that it must rise to the level of at least a petty disorderly offense or it could be more." The judge further noted that "apparently the petitioner was her brother . . . who lives with the grandmother who [S.S.] indicates has a very good relationship with [S.S.], but [S.S.] objected to the [social worker] testifying as to what the grandmother said." The judge concluded he had "to draw an adverse inference from that because [S.S.] says I have a great relationship with my grandmother. I just don't want you to know what my grandmother has to say."

Noting that "after 26 days, people usually show improvement," the judge found the doctor did not indicate that was the case here, based on S.S. remaining on close supervision. The judge found S.S. was not cooperative with treatment, refusing to permit vitals, and thus preventing the staff from

monitoring her hypertensive condition. Noting S.S.'s four prior hospitalizations during the past year, the judge stated "at least four prior times, there's been at least a temporary order of commitment."

Turning to the issue of placement and the testimony of the social worker about S.S.'s rejection by Parkwoods, the judge said, "if she can't be accepted at a supervised setting, I have no idea where she would go." The judge explained he found that "significant evidence when Parkwoods, who accepts virtually everybody, won't accept her. . . . That indicates to me that she is not ready to leave when a supervised setting will not accept her." The court concluded "it would be frivolous to put her on CEPP to a supervised setting, because they've already said no."

S.S. appeals, arguing the court erred in concluding the prior entry of a domestic violence restraining order could conclusively establish a patient was dangerous to others under New Jersey's civil commitment statutes or that collateral estoppel could be applied to relieve the State of its burden of proving the need for commitment by clear and convincing evidence. She further contends the court erred in concluding an adverse inference could be drawn against a patient asserting a

hearsay objection, and that the State failed to prove by clear and convincing evidence that S.S. was a danger to herself.

The scope of appellate review of a civil commitment is "extremely narrow." State v. Fields, 77 N.J. 282, 311 (1978) (reviewing the involuntary commitment of a defendant found not guilty by reason of insanity). We review a commitment determination only for abuse of discretion. In re D.C., 146 N.J. 31, 58-59 (1996). The Court has directed that in conducting our review, we are to accord "the utmost deference" to "the reviewing judge's determination as to the appropriate accommodation of the competing interests of individual liberty and societal safety in the particular case." Fields, 77 N.J. at 311. Because even according that deference here it is obvious the State did not meet its burden of proving S.S.'s continued need for involuntary commitment on this record, we conclude the judge mistakenly exercised his discretion in continuing her commitment.

An order of continued commitment is only appropriate if the State has presented clear and convincing evidence that

> (1) the patient is mentally ill, (2) mental
> illness causes the patient to be dangerous
> to self or dangerous to others or property
> as defined in N.J.S.A. 30:4-27.2(h) and
> -.2(i), (3) the patient is unwilling to be
> admitted to a facility for voluntary care or
> accept appropriate treatment voluntarily,

8                                           A-5605-15T4

and (4) the patient needs outpatient treatment as defined by N.J.S.A. 30:4-27.2(hh) or inpatient care at a short-term care or psychiatric facility or special psychiatric hospital because other less restrictive alternative services are not appropriate or available to meet the patient's mental health care needs.

[R. 4:74-7(f)(1); see also N.J.S.A. 30:4-27.2(m).]

As used in the Court Rule, "[m]ental illness" "means a current, substantial disturbance of thought, mood, perception or orientation which significantly impairs judgment, capacity to control behavior or capacity to recognize reality." N.J.S.A. 30:4-27.2(r). A person is "[d]angerous to self" if

by reason of mental illness the person has threatened or attempted suicide or serious bodily harm, or has behaved in such a manner as to indicate that the person is unable to satisfy his need for nourishment, essential medical care or shelter, so that it is probable that substantial bodily injury, serious physical harm or death will result within the reasonably foreseeable future.

[N.J.S.A. 30:4-27.2(h).]

A person is "[d]angerous to others or property" if

by reason of mental illness there is a substantial likelihood that the person will inflict serious bodily harm upon another person or cause serious property damage within the reasonably foreseeable future. This determination shall take into account a person's history, recent behavior and any recent act, threat or serious psychiatric deterioration.

[N.J.S.A. 30:4-27.2(i).]

Because S.S. concedes she suffers from a mental illness, our focus is on whether the State proved she was a danger to herself or others. We think it plain that S.S.'s refusal to submit to having her blood pressure taken on one or two occasions during her twenty-six-day stay at Northbrook does not satisfy the statutory standard of dangerousness to self. Even crediting the psychiatrist's opinion that "refusing vitals when you're on anti-hypertensives shows at least a gross disregard for your own health and safety," his acknowledgement that S.S. was taking her blood pressure medication and his inability to testify that S.S.'s non-compliance had any effect on her health means we need not consider the issue further. See In re Commitment of Robert S., 263 N.J. Super. 307, 311 (App. Div. 1992) (walking on nails spilled from a toolbox and turning on a gas stove when the house got chilly insufficient to establish mentally ill veteran was a danger to himself).

Turning to the court's finding that S.S. was dangerous to others, S.S. urges us to consider the extent to which a judge reviewing a civil commitment can rely on an order entered in a proceeding under the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35. We decline to do so as it is patently clear no reliance can be placed on an order not produced at the

hearing, that no one has seen and where there is no indication of whether it was a temporary or final order, entered ex parte or after a full hearing and whether the act of domestic violence was homicide or harassment. Cf. State v. Silva, 394 N.J. Super. 270, 275 (App. Div. 2007) (holding that findings from an FRO trial were not judicially noticeable in a subsequent criminal trial regarding the same conduct).

County Counsel, representing the State here, "takes no position" with regard to the evidentiary errors S.S. claims the judge made in permitting the social worker to testify to the oral reports she received from someone else regarding S.S.'s alleged "outburst" on the morning of the hearing and from a staff member at Parkwoods. We take that to mean it concedes the statements were hearsay, not subject to any exception. See In re Commitment of J.B., 295 N.J. Super. 75, 78-79 (App. Div. 1996) (cautioning against the admission of inadmissible hearsay in the form of testifying witnesses reciting information provided by others). Although the judge appeared to consider the social worker's testimony about the statement the Parkwoods staffer made to her, reporting what S.S. allegedly said to him, to constitute a statement of a party-opponent, N.J.R.E. 803(b)(1), or one against S.S.'s interest, N.J.R.E. 803(c)(25),

he did not address N.J.R.E. 805's requirement that each hearsay statement meet an exception to N.J.R.E. 802.

County Counsel also makes no attempt to defend the court having drawn an adverse inference from a properly lodged hearsay exception to the testimony the social worker wished to offer regarding her conversations with S.S.'s grandmother. We can find no justification for such a patently improper ruling abridging S.S.'s right to insist the State confine itself to admissible evidence in shouldering its burden to prove by clear and convincing that she required further commitment. In re Commitment of M.M., 384 N.J. Super. 313, 334 (App. Div. 2006).

Because the State could not properly rely on the domestic violence restraining order to establish S.S.'s dangerousness to others, or the social worker's report of what others told her, the State's proofs on this point rest solely on the testimony of the psychiatrist. He, however, was only filling in for S.S.'s treating doctor and could offer nothing more than "the admit reasons" and the same oral report the social worker offered about an alleged "outburst" the morning of the hearing. We have before cautioned that judges "must take care to avoid any use of an expert's testimony about the foundation for an opinion as proof of facts that are neither derived from nor established by otherwise admissible evidence." Id. at 335. As the

psychiatrist had no idea of the source of the information for "the admit reasons," see J.B., 295 N.J. Super. at 78-79, and the State offered no competent proof of S.S.'s alleged "outburst" the morning of the hearing, even assuming such would be sufficient to prove her dangerousness to others, its proofs that she was a danger to others were decidedly lacking. See M.M., 384 N.J. Super. at 334 (quoting In re Commitment of G.G.N., 372 N.J. Super. 42, 59 (App. Div. 2004) ("The evidence must permit the judge 'to come to a clear conviction [that person is mentally ill and dangerous], without hesitancy.'")).

The importance of the individual and public interests implicated by involuntary civil commitment compel the trial judge to assiduously attend to the need to make adequate findings. In re Commitment of S.D., 212 N.J. Super. 211, 218-19 (App. Div. 1986). "A judge presiding over a commitment hearing is vested with extraordinary responsibility; when the judge does not apply the legal standards and find the relevant facts, our subsequent correction of the abuse of discretion is a poor remedy for the ill." M.M., 384 N.J. Super. at 332-33. It does, however, serve to prevent repetition of errors capable of leading to unconstitutional confinement.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

13                                                      A-5605-15T4