# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-3251-17T2
A-3260-17T2

IN THE MATTER OF THE
COMMITMENT OF J.M.

_____

IN THE MATTER OF THE
COMMITMENT OF D.D.

_____

Argued February 27, 2019 - Decided April 8, 2019

Before Judges Accurso and Vernoia.

On appeal from Superior Court of New Jersey, Law Division, Atlantic County, Docket No. ATCC000072-18 (in A-3251-17) and Mercer County, Docket No. MECC000670-17 (in A-3260-17).

Lorraine Gormley-Devine, Assistant Deputy Public Defender, argued the cause for appellant J.M., Docket No. A-3251-17 (Joseph E. Krakora, Public Defender, attorney; Lorraine Gormley-Devine, on the briefs).

Lorraine Gormley-Devine, Assistant Deputy Public Defender, argued the cause for appellant D.D., Docket No. A-3260-17 (Joseph E. Krakora, Public Defender, attorney; Lorraine Gormley-Devine and Amy B. Denero, Assistant Deputy Public Defender, on the briefs).

Anne E. Walters, Assistant County Counsel, argued the cause for respondent State of New Jersey, Docket Nos. A-3251-17 and A-3260-17 (Christopher A. Orlando, Camden County Counsel, attorney; Anne E. Walters, on the briefs).

PER CURIAM

J.M. and D.D. appeal from February 6, 2018 orders continuing their involuntary civil commitments pursuant to R. 4:74-7.  Although the cases are not related, they were decided by the same judge on the same day, the same psychiatrist testified in each case, they raise the same issue and the parties are represented by the same counsel.  The cases were argued back-to-back and we now consolidate them for disposition in this opinion.  J.M. and D.D. argue the State failed to prove by clear and convincing evidence they were in continued need of involuntary commitment pursuant to N.J.S.A. 30:4-27.1 to -27.23 and R. 4:74-7.  We agree in each instance and reverse both orders.

J.M.

J.M. was involuntarily committed at Northbrook Hospital in Camden County on January 18, 2018.  At his initial commitment hearing on February 6, he testified he was a former IT executive for a national bank until 2000, when he left the bank to start a software company.  That venture failed, as did several others, forcing him into bankruptcy.  J.M. testified he became

depressed, leading to several involuntary commitments some years back. He claimed he collects $2200 a month in social security disability benefits and had recently moved to Atlantic County to get back on his feet because the motels there are cheaper than in Hudson County.

His treating psychiatrist, Dr. Campo, testified J.M. suffered from an unspecified psychosis with major depressive disorder with psychotic features. He claimed J.M. was a danger to himself because, although compliant with the Risperdal prescribed to treat his mental illness, he had refused the Glyburide prescribed for his Type II diabetes. J.M. testified he refused the Glyburide after he suffered twenty-four hours of diarrhea. The doctor acknowledged J.M. had complained of "G.I. problems which might be due to the medication or there's also the flu bug going around." Asked whether diarrhea was a side effect of Glyburide, the doctor replied: "Not to my knowledge[,] . . . [i]t most likely was the bug that was going around."

Dr. Campo testified J.M. had "a fair degree" of insight into "his psychosis or major depression disorder" and a "fair" mastery of the activities of daily living. When asked by County Counsel whether J.M. was currently psychotic, the doctor replied: "I — I — well, I — he's — to my mind, at least, mistaken in his opinion that the Glyburide is causing his symptomology."

3

Asked about the effects of J.M.'s failure to take the Glyburide, Dr. Campo responded: "It increases your blood sugar which in time is disruptive to virtually every organ in the body."

The doctor's recommendation for J.M. was "to resume taking the Glyburide or get it switched . . . if [he] truly doesn't want to take that medication" because "he needs to be on something orally for the diabetes." Dr. Campo testified no less restrictive environment than Northbrook would be appropriate for J.M. until "we resolved that issue." The doctor testified "[i]t's something that really needs to get hammered out before he leaves[,] . . . particularly, if he's living at a motel."

Dr. Campo conceded on cross-examination he was unaware of whether J.M.'s blood sugar was within a normal range upon admission or whether he was treating with a physician for the condition before he was admitted. The doctor testified J.M. did not refuse insulin while at Northbrook, although stating he did not "think he's really needed it that much."

J.M. testified he was "complying with psych medications, but diabetes medication was causing complications." He claimed his was "not an outright refusal. It was a result of a medical reaction or the flu bug . . . that was severely going around the unit." J.M. agreed with Dr. Campo that he needed

4

"to be on something orally for the diabetes," but wanted to ascertain "whether it was the Glyburide or the bug outbreak" that caused his G.I. problem.

Based on Dr. Campo's testimony, the judge found J.M. suffered from a mental illness, psychosis, not otherwise specified. The judge did not make a specific finding that J.M. was a danger to himself or others. He found "Dr. Campo testifies, and Dr. Campo is a doctor and [J.M.] is not . . . that [J.M.] does have diabetes and does require Glyburide for his diabetes." The judge found if J.M. "doesn't take that medication, it's not speculative, it will do substantial bodily harm." The judge entered an order continuing J.M.'s involuntary commitment, scheduling a review hearing in one week's time. At the review hearing, the judge approved J.M. for CEPP (conditional extension pending placement) status pursuant to R. 4:74-7(h)(2) and scheduled a review hearing for two weeks' time. J.M. was discharged two days later to a halfway house.

D.D.

D.D., an alleged insulin-dependent diabetic, was admitted to Northbrook on January 6, 2018, after having been on CEPP status at St. Francis Medical Center in Mercer County. Northbrook sought her involuntary commitment at an initial hearing on February 6. Dr. Campo testified D.D. was initially

committed based on reports of having been aggressive toward her mother and sister. He testified she suffered from a mental illness, schizoaffective disorder, and was then unable to care for herself because she was "refusing some medications. She refused her finger-stick, I believe, this morning." Asked whether that was the first time D.D. had refused a finger-stick, Dr. Campo testified he "didn't review the whole monitoring. I presume that she's refused it other times before since she's refusing some medication." Dr. Campo explained he was not D.D.'s treating psychiatrist and thus had seen her only two or three times.

Although acknowledging D.D. had shown improvement during her stay, Dr. Campo testified she was not "ready" for CEPP status. He claimed she had been verbally aggressive and was "barking at her [social worker] up until recently." He testified he would "like . . . to see her become more cooperative, more organized, and stop refusing necessary medical procedures and medication." He suggested a three-week review period would be sufficient.

On cross-examination, Dr. Campo was asked whether he was sure D.D. had refused a finger-stick before that morning. He replied he was "not positive[,] . . . [b]ut if she refused it today, she most likely refused it other times." When counsel for D.D. clarified that she was not asking the doctor for

6

his speculation, the doctor replied, "it's not speculation." Counsel then reasonably followed up by asking on what other occasions had D.D. declined the procedure. That question led to the following exchange with the judge:

> THE COURT: He just answered that question. He just answered that question. He answered the question.
>
> COUNSEL: Okay. When was it that she refused on other times?
>
> THE COURT: He said it was not speculation, that if — if she did it once, she would have done it at other times.
>
> COUNSEL: And I'm asking him what other times.
>
> THE COURT: And that is — he just answered the question. He answered the question.
>
> COUNSEL: I'm asking for a specific . . . .
>
> THE COURT: He doesn't know.
>
> COUNSEL: If I could get an answer from the . . . .
>
> THE COURT: You can't — you can't.
>
> THE COURT: He said he doesn't have any specific indication. But, if you refused it once, she would have done it before.
>
> COUNSEL: Okay?
>
> THE COURT: And he said [he] doesn't have any record of anything else other than that.

A-3251-17T2

COUNSEL: Okay.

Dr. Campo testified he had "no idea" whether D.D.'s last finger-stick was "within normal range" but stated it was "most likely not." He went on to explain the hospital does not "do finger-sticks" on people with normal blood sugars. "If someone's getting regular finger-sticks, it indicates that it's almost always not in the normal range." Although the doctor testified D.D. was refusing medications, he never specified what the medications were or how often they were refused. He did acknowledge there did not "seem to be a pattern to it."

D.D. testified she was homeless because she could not return to live with her mother in Mercer County. D.D. testified she was sixty years old and had been diagnosed with Type II diabetes at twenty-five. She claimed the doctor she saw before being committed had taken her off medication for diabetes and she did not take insulin. D.D. was reluctant to admit she had a mental illness, although acknowledging she had been hospitalized before and was under psychiatric care and taking medication before being committed. She testified she had "an anxiety disorder."

D.D.'s counsel acknowledged D.D. "obviously, does need housing" but contended the failure to submit to a finger-stick on one occasion did not meet

8

the statutory criteria for involuntary commitment. She accordingly asked that D.D. be returned to CEPP status.

The judge found, based on Dr. Campo's "very credible and convincing" testimony that the State proved by clear and convincing evidence that D.D. suffers from a mental illness, schizoaffective disorder. He further found "it would be absolutely inappropriate to return her to CEPP status at this time. She absolutely could not survive in a less restrictive setting right now." The judge found "the doctor testified that if she missed one [finger-stick], or refused one, she would have refused others and that that would not be speculation at all. That would be in fact medically what happened."

The judge did not make a specific finding that D.D. was a danger to herself, but only "[t]he refusal to participate with the diabetes can absolutely result in substantial bodily harm." The judge found D.D. does not "want to be a voluntary patient" but was instead focused on getting out. The judge stated "[i]f she wants to get out, she is going to have to cooperate better with the treatment team at this hospital. She's clearly a very intelligent person who is confused right now due to her not taking her medication."

A-3251-17T2

Analysis

Although we review a commitment determination only for abuse of discretion, In re D.C., 146 N.J. 31, 58-59 (1996), we think it self-evident that neither of these orders for continued involuntary commitment can stand. The record in each instance "reveals a clear mistake in the exercise of the reviewing judge's broad discretion in evaluating the committee's present condition." State v. Fields, 77 N.J. 282, 289-90, 311 (1978) (reviewing the involuntary commitment of a defendant found not guilty by reason of insanity).

An order of continued commitment is only appropriate if the State has presented clear and convincing evidence that

> (1) the patient is mentally ill, (2) mental illness causes the patient to be dangerous to self or dangerous to others or property as defined in N.J.S.A. 30:4-27.2(h) and -.2(i), (3) the patient is unwilling to be admitted to a facility for voluntary care or accept appropriate treatment voluntarily, and (4) the patient needs outpatient treatment as defined by N.J.S.A. 30:4-27.2(hh) or inpatient care at a short-term care or psychiatric facility or special psychiatric hospital because other less restrictive alternative services are not appropriate or available to meet the patient's mental health care needs.
>
> [R. 4:74-7(f)(1); see also N.J.S.A. 30:4-27.2(m).]

As used in R. 4:74-7(f)(1)(2), "'[m]ental illness' means a current, substantial disturbance of thought, mood, perception or orientation which significantly impairs judgment, capacity to control behavior or capacity to recognize reality." N.J.S.A. 30:4-27.2(r). A person is "[d]angerous to self" if

> by reason of mental illness the person has threatened or attempted suicide or serious bodily harm, or has behaved in such a manner as to indicate that the person is unable to satisfy his need for nourishment, essential medical care or shelter, so that it is probable that substantial bodily injury, serious physical harm or death will result within the reasonably foreseeable future.
>
> [N.J.S.A. 30:4-27.2(h).]

Because neither J.M. nor D.D. contends the State failed to prove mental illness,[1] the first prong of the statutory test, our focus is on whether the State proved clearly and convincingly that they were a danger to themselves. The

---

[1] We note, however, that Dr. Campo's testimony in response to County Counsel's question as to whether J.M. was "currently psychotic," i.e., that he was "at least mistaken in his opinion that the Glyburide is causing his symptomology," appears to fall far short of establishing J.M. suffered from "a current, substantial disturbance of thought, mood, perception or orientation which significantly impairs judgment, capacity to control behavior or capacity to recognize reality." N.J.S.A. 30:4-27.2(r). A medical diagnosis is not determinative of whether a patient suffers from a "mental illness" as defined by the Legislature. In re Commitment of M.M., 384 N.J. Super. 313, 337 (App. Div. 2006). Because J.M. concedes mental illness on appeal, and we reverse for other reasons, we need not consider whether the State established J.M. suffered from a mental illness as defined by the statute.

11

State did not allege either J.M. or D.D. posed any risk to anyone else. See N.J.S.A. 30:4-27.2(i) (defining when a person is "[d]angerous to others or property").

Having reviewed the record, we think it plain the State failed to carry its burden to prove by clear and convincing evidence that J.M. and D.D. "by reason of mental illness" had "behaved in such a manner as to indicate" they were unable to satisfy their need for "essential medical care," making it "probable that substantial bodily injury, serious physical harm or death [would] result within the reasonably foreseeable future." See N.J.S.A. 30:4-27.2(h) (emphasis added). Although we certainly do not question that untreated Type II diabetes can have severe and debilitating effects on one's health, "the risk of dangerousness that will warrant involuntary commitment must be relatively immediate." In re Commitment of N.N., 146 N.J. 112, 130 (1996). The State must show "a substantial risk of dangerous conduct within the reasonably foreseeable future," In re Commitment of S.L., 94 N.J. 128, 138 (1983) (quoting State v. Krol, 68 N.J. 236, 260 (1975)), not at some unspecified time months or years hence.

Even assuming J.M.'s refusal to take the Glyburide prescribed him was a product of his mental illness as opposed to a reasoned response to his G.I.

12                                                          A-3251-17T2

distress, Dr. Campo's testimony of the danger refusal posed to J.M. — that it would "in time [be] disruptive to virtually every organ in the body" — falls woefully short of establishing the "relatively immediate" danger the statute requires. Accordingly, the judge's decision to continue J.M.'s involuntary commitment with no showing that J.M.'s refusal of the Glyburide would have any ill effect on his health within the reasonably foreseeable future was an abuse of discretion.

As to D.D., the record is even more lacking. The only evidence of dangerousness proffered by the State was D.D.'s refusal of a finger-stick to monitor her blood sugar the morning of the hearing. Dr. Campo's testimony that she refused unspecified medications on unknown dates is obviously not competent proof of the fact. The doctor's assertion that because D.D. refused one finger-stick "she most likely refused it other times," is, as her counsel argued, nothing more than rank speculation.

Notwithstanding the judge's assertion, Dr. Campo's surmise that D.D. refused other finger-sticks obviously does not make that "in fact medically what happened." The evidence the State presented in D.D.'s initial hearing at Northbrook was clearly inadequate to satisfy its burden to prove by clear and convincing evidence that D.D. was dangerous to herself on the date of the

13

hearing. See In re Commitment of J.R., 390 N.J. Super. 523, 531 (App. Div. 2007). D.D.'s refusal to submit to a finger-stick on one occasion during her stay at Northbrook simply cannot satisfy the statutory standard of dangerousness to self. Accordingly, the judge clearly abused his discretion in continuing her commitment on this record. See In re Commitment of Robert S., 263 N.J. Super. 307, 311-13 (App. Div. 1992).

To say we find the record of these two hearings troubling would be an understatement. As we have stressed on several other occasions, the importance of the individual and public interests implicated by involuntary civil commitment compel the trial judge to assiduously attend to the need to make adequate findings. In re Commitment of S.D., 212 N.J. Super. 211, 218-19 (App. Div. 1986). As Judge Fritz noted more than thirty years ago in S.D.,

> We do not doubt that trial judges are harried by the number of R. 4:74-7(f) hearings assigned to them day after day, many times held in the cloistered halls of the mental institution. It would come as no surprise if any of those judges became either inured or enervated by this constant, unrelieved association with the mentally deprived and their lay and medical guardians to the extent that the beleaguered judge failed to dot every "i" or cross every "t." This, however, is no reason for them or for us to forget that which is the basic teaching of S.L.: that each one in the bundle of rights of these committed persons deserves protection.
>
> [Id. at 219.]

"A judge presiding over a commitment hearing is vested with extraordinary responsibility; when the judge does not apply the legal standards and find the relevant facts, our subsequent correction of the abuse of discretion is a poor remedy for the ill." M.M., 384 N.J. Super. at 332-33. We certainly expect it will serve to prevent repetition of errors capable of leading to unconstitutional confinement.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3251-17T2