916 A.2d 463 (2007)
390 N.J. Super. 523
In the Matter of the COMMITMENT OF J.R.
Superior Court of New Jersey, Appellate Division.
Argued December 5, 2006.
Decided January 3, 2007.
*464 Stanley M. Shur, Assistant Deputy Public Advocate, argued the cause for appellant (Ronald K. Chen, Public Advocate, attorney; Mr. Shur, on the brief).
William P. Busch, Jr., Assistant County Counsel, argued the cause for respondent (James F. Ferguson, Atlantic County Counsel, attorney; Mr. Busch, on the brief).
Before Judges SKILLMAN and HOLSTON, JR.
The opinion of the court was delivered by
HOLSTON, JR., J.A.D.
Appellant, J.R., appeals the Law Division's March 31, 2006 order continuing his involuntary civil commitment at Ancora Psychiatric Hospital (Ancora), pursuant to N.J.S.A. 30:4-27.15, with a review hearing in one week. We reverse.
On January 22, 2006, J.R. was initially admitted to Ancora. On February 3, 2006, J.R. was conditionally released and remained on conditional release (CR) until his readmission to Ancora on March 24, 2006.
At the re-commitment hearing held on March 31, 2006, the only witness called by the State was Dr. M. Rozmyslowicz, J.R.'s treating psychiatrist. Dr. Rozmyslowicz's report dated March 28, 2006 was also admitted into evidence by stipulation. The report states: "[J.R.] returned from CR [because he] did not take his medications [and] decompensated."
The doctor testified that she made an Axis 1 diagnosis of J.R. of "bi-polar disorder. Most recent episode mixed and for substance dependent." When Dr. Rozmyslowicz was asked her recommendation for further hospitalization and treatment, the doctor testified that "on Monday, I felt that it's too early to put [J.R.] on CEPP (Conditional Extension Pending Placement) status.[1] So I would like to ask the court to have more days." However, when asked if J.R. were released into the community, whether J.R. would "present a danger to himself or others," Dr. Rozmyslowicz replied: "The only danger that *465 [J.R.] may present is that he may stop taking his medication as happened last time." (emphasis added). When asked the basis for her opinion that "[J.R.] might present a danger to others," the doctor stated: "Actually, Monday, when I examined that patient, I knew that over the weekend before, the patient was verbally assaultive to the staff and he presented with careless smoking."
In response to the judge's questioning as to what kind of conduct or symptoms [J.R.] exhibited as a result of his failure to take his medication, which precipitated J.R.'s readmission to Ancora, the doctor responded: "Patient's manic symptoms exacerbated. He was aggressive verbally." However, the doctor stated that she did not know of any incidents during J.R.'s release, between February 3 and March 24, 2006, where he assaulted anyone in the community.
The judge then conducted most of the remainder of the hearing. The judge directed the doctor to the screening documents that supported J.R.'s rehospitalization. The records had not been admitted into evidence and were never placed in evidence during the remainder of the hearing.[2] The judge referred the doctor to references in the documents that indicated J.R. "wasn't taking his medications, he decompensated and became aggressive." However, Dr. Rozmyslowicz testified that J.R. had not been aggressive toward anyone at the hospital in the last four days and that his condition had improved. He remained on level one observation because of his cigarette smoking and because of intrusive behavior. The doctor added: "But this behavior is drastically reduced right now."
On cross-examination, the doctor opined that if J.R. continued on his medications, he would be able to be satisfactorily discharged into the community. She reiterated that she had no indication that J.R. had acted to harm himself or others.
The judge then asked J.R. if there was anything he wanted to tell him. J.R. told the judge that he understood the need for him to take prescribed medications, but that he had run out of medication because he had only been given a month's supply. The judge challenged J.R.'s assertion by referencing the screening documents, which the judge suggested indicated J.R. told the screener that he did not feel he needed medication. J.R. explained to the judge that he now had the ability to maintain his medication regimen. J.R. stated: "The stuff they got me on now, I'm pretty stable and happy with it and I can continue with Ocean Mental Health 12 hours a week. You know, you sit, you eat dinner there, you've got groups, classes[.]"
J.R.'s counsel next called S.W., J.R.'s girlfriend, as a witness. S.W. testified that she had daily contact with J.R., was aware of his psychiatric needs, and that she and he had discovered, with the aid of his social worker, alternative sources for obtaining J.R.'s medication to enable him to maintain his supply. One of those sources was Ocean County Mental Health. She testified that J.R. had not acted out to harm himself or others. S.W. confirmed that she drove J.R. to his daily activities, which included going to see his probation officer, going to his programs in the evening, and going to church. S.W. testified that J.R. took his medications until they ran out, something she claimed both his probation officer and social worker also knew.
S.W. informed the judge that the symptoms J.R. displayed when he ran out of his *466 medications were that he became tired and lazy, and did not want to shower. She also said that he becomes manic, "he just [concentrates] on [the] same thought over and over again. He's never harmful to society or harmful to himself, ever. You know, he's never done anything ill-fated, ever."
S.W. testified that the reason she brought J.R. to the Kimball Medical Center about a month after he was released from Ancora was because:
He wasn't feeling well. He said to me, I'm not feeling well, my medications have run out, I need assistance. And, that is why we went back to the PAD center, not because of any altercation within the community or with any individuals or anything, he simply ran out of medicine. And, although I don't live with him, I have to tell you that I watch him take his medicine. He was taking it religiously.
The judge, without providing counsel with the opportunity for closing arguments, rendered his commitment decision. The judge read from the screening documents and recited the narrative allegations in the documents as background to J.R.'s rehospitalization. The judge then made the following findings:
We have had the testimony of Dr. Rozmyslowicz, who I accept her opinion that [J.R.] suffers from bi-polar disorder. He, since returning here on March 24th, has been disruptive. He seems to not be able to follow the rules and directions of the institution. As a result, he has been placed on level one. He is currently on precautions for assault and for violating other conditions. And, this conduct is troubling to me in the fact that [J.R.] in the past was released with conditions that he would take his medication and he decompensated.
And, we have two different versions of why he decompensated. I find that the credible version and the clear and convincing facts convince me that the reason that [J.R.] returned here was due to his own voluntary cessation of taking medication. I conclude that based on his conduct since he's been here, which has not been in compliance with directions of the staff and the doctors.
I'm encouraged by the fact that [J.R.] has not had any incidents in the last four days. I'm encouraged by the fact that he's taking his medication and seems very good here today. I, however, am satisfied by clear and convincing evidence that as of today, March 31st, patient suffers from mental illness and does remain a danger to himself and to others based on the fact that I don't believe he'll take his medication, will rapidly decompensate and will be right back here as we've already seen by the facts that led to his return from the conditional release.
. . . .
I do find that he's not only dangerous to himself but to others. I find both are as the result of his non-compliance issues when he is released as he has demonstrated by his non-compliance on the conditional release earlier this year. And, if he does not take his medication as [S.W.] indicated, he becomes very agitated, he becomes very manic and we have seen assaultive behavior. And, that can lead to someone responding to him and assaulting him also. So that's why I conclude that he is both dangerous to himself and to others.
J.R. presents the following arguments for our consideration:
POINT I.
THE TRIAL COURT ERRED IN FINDING J.R. WOULD BE DANGEROUS IN RELIANCE ON HEARSAY EVIDENCE AND ITS OWN *467 SPECULATION, CONTRADICTED BY THE COMPETENT EVIDENCE PRESENTED AT THE HEARING.
POINT II.
J.R.'S APPEAL IS NOT MOOT.
POINT III.
THE TRIAL COURT ERRED IN ITS AGGRESSIVE EXAMINATION OF WITNESSES AND IN SOLICITING AND RELYING ON HEARSAY ASSERTIONS TO SUPPORT ITS CONCLUSION; THE TRIAL COURT IMPROPERLY CARRIED THE CASE FOR COMMITMENT.

I.
The civil commitment procedure is governed by New Jersey's screening and commitment statute, N.J.S.A. 30:4-27. For a court to order involuntary commitment, the court must find by clear and convincing evidence that a patient is "in need of continued involuntary commitment. . . ." R. 4:74-7(f)(1).
The Legislature has defined the following terms for purposes of N.J.S.A. 30:4-27:
"In need of involuntary commitment" means that an adult with mental illness, whose mental illness causes the person to be dangerous to self or dangerous to others or property and who is unwilling to be admitted to a facility voluntarily for care, and who needs care at a short-term care, psychiatric facility or special psychiatric hospital because other services are not appropriate or available to meet the person's mental health care needs.
[N.J.S.A. 30:4-27.2m.]
"Dangerous to self" means that by reason of mental illness the person has threatened or attempted suicide or serious bodily harm, or has behaved in such a manner as to indicate that the person is unable to satisfy his need for nourishment, essential medical care or shelter, so that it is probable that substantial bodily injury, serious physical debilitation or death will result within the reasonably foreseeable future; however, no person shall be deemed to be unable to satisfy his need for nourishment, essential medical care or shelter if he is able to satisfy such needs with the supervision and assistance of others who are willing and available.
[N.J.S.A. 30:4-27.2h.]
"Dangerous to others or property" means that by reason of mental illness there is a substantial likelihood that the person will inflict serious bodily harm upon another person or cause serious property damage within the reasonably foreseeable future. This determination shall take into account a person's history, recent behavior and any recent act or threat.
[N.J.S.A. 30:4-27.2i.]
The State bears the burden of proving the grounds for commitment by clear and convincing evidence. In re Commitment of Raymond S., 263 N.J.Super. 428, 431, 623 A.2d 249 (App.Div.1993); N.J.S.A. 30:4-27.12. "The burden should not be placed on the civilly committed patient to justify his right to liberty." State v. Fields, 77 N.J. 282, 300, 390 A.2d 574 (1978) (quoting Fasulo v. Arafeh, 173 Conn. 473, 378 A.2d 553, 557 (1977)).
To justify an involuntary commitment, it is necessary to show more than the potential for dangerous conduct. In re Commitment of R.B., 158 N.J.Super. 542, 547, 386 A.2d 893 (App.Div.1978). "[T]he risk of dangerousness that will warrant involuntary commitment must be relatively immediate. . . ." In re Commitment of N.N., 146 N.J. 112, 130, 679 A.2d 1174 (1996). There must be, in fact, a "substantial risk of dangerous conduct within the *468 reasonably foreseeable future." In re S.L., 94 N.J. 128, 138, 462 A.2d 1252 (1983) (quoting State v. Krol, 68 N.J. 236, 260, 344 A.2d 289 (1975)).
This court has not hesitated to reverse involuntary commitments where the record failed to contain clear and convincing evidence of a substantial risk of dangerous conduct within the reasonably foreseeable future. See Raymond S., supra, 263 N.J.Super. at 433-34, 623 A.2d 249 (finding insufficient evidence to support commitment despite testimony that patient was hallucinating, psychotic and depressed upon admission); R.B., supra, 158 N.J.Super. at 547, 386 A.2d 893 (holding evidence of mood swings alone insufficient to support conclusion that patient was dangerous to self); In re Heukelekian, 24 N.J.Super. 407, 411, 94 A.2d 501 (App.Div.1953) (holding commitment not warranted despite testimony that patient was disoriented and seemed to live in her own fantasy world).
The judge's finding of dangerousness was based essentially on the judge's belief that if J.R. fails to take his medication, he can become agitated and manic "and we have seen assaultive behavior." The judge stated that J.R.'s behavior could lead to someone assaulting him, which could cause him to be dangerous to himself as well.
Although it is recognized that on appeal deference is given to the findings of the trial court, "a reviewing court must consider the adequacy of the evidence. To be adequate, the evidence must be competent." In re Commitment of M.M., 384 N.J.Super. 313, 334, 894 A.2d 1158 (App. Div.2006).
We are convinced that the evidence presented in J.R.'s recommitment hearing was clearly inadequate to satisfy the State's burden to prove by clear and convincing evidence that J.R. at the date of the March 31, 2006 hearing was dangerous to himself, others or property by reason of mental illness. N.J.S.A. 30:4-27.15a; N.J.S.A. 30:4-27.2m; R. 4:74-7(f).
The only witness called by the State was Dr. Rozmyslowicz. Dr. Rozmyslowicz's testimony clearly does not support the court's finding of dangerousness. When questioned regarding the danger that could ensue should J.R. be released, Dr. Rozmyslowicz responded: "The only danger [J.R.] may present is that he may stop taking his medications . . . [and] his mental status [may] exacerbate and he may return to the hospital." In her commitment report of May 28, 2006, the doctor indicated that J.R. was potentially dangerous to others because he had been "verbally aggressive toward staff" in the past and had engaged in "careless smoking." However, the doctor offered no explanation as to how the general description of J.R. as "manic," "very agitated," "verbally aggressive or assertive," or "careless smoking" evidenced themselves so as to cause J.R. to pose a danger to himself, others, or property.
While the language of N.J.S.A. 30:4-27.2i requires the infliction of "serious bodily harm" to either oneself or others, New Jersey does recognize the possibility that psychological harm, e.g., from a "verbal assault," may suffice. In In re Commitment of A.A., 252 N.J.Super. 170, 179, 599 A.2d 573 (App.Div.1991), this court held that N.J.S.A. 30:4-27.2i could be satisfied if the "substantial likelihood of psychological harm to others [was] so severe as to inflict `serious bodily harm upon another person.'"
In this case, there was no evidence presented regarding the nature of the abusive statements made by J.R. to the staff, the context in which they were made, or even the demeanor and tone used by J.R. to convey these sentiments. Simply characterizing his statements as "aggressive" *469 is insufficient to satisfy the requirement of clear and convincing evidence of "the substantial likelihood of psychological harm to others so severe as to inflict `serious bodily harm upon another person' within the meaning of N.J.S.A. 30:4-27.2i." Ibid.
Similarly, there is no evidence presented regarding the nature of Dr. Rozmyslowicz's "careless smoking" allegation to support the trial court's finding of dangerousness. Nothing in the record indicates whether "careless smoking" referred to a relatively minor infraction, such as smoking after hospital curfew, or a more serious danger, such as lighting a cigarette next to an oxygen reserve.
Moreover, even if there were evidence to show J.R.'s statements were sufficiently harmful to satisfy the "serious bodily harm" requirement, there was nevertheless insufficient evidence presented at the hearing to show there was a substantial likelihood the harm would recur. In In re Commitment of W.H., the State's expert testified that the likelihood the patient could pose a danger to himself or others was a possibility, but could not state that it was a probability. 324 N.J.Super. 519, 522, 736 A.2d 529 (App.Div.1999). The court found the expert's testimony insufficient to constitute clear and convincing evidence of a "substantial likelihood" of future harm. Id. at 523, 736 A.2d 529.
Dr. Rozmyslowicz's testimony that there is a possibility J.R. may stop taking his medication is insufficient to constitute clear and convincing evidence of a substantial likelihood of future harm necessary for involuntary confinement. Ibid. Moreover, there was substantial evidence presented by J.R. showing the failure to take his medication was unlikely to recur. Corroborating J.R.'s own testimony, S.W. testified at length to the steps both she and J.R. have taken to ensure J.R. will not run out of medication in the future.
"The civil commitment process must be narrowly circumscribed because of the extraordinary degree of state control it exerts over a citizen's autonomy." S.L., supra, 94 N.J. at 139, 462 A.2d 1252. Because commitment effects a serious deprivation of liberty, citizens are entitled to "the meticulous protection of both procedural and substantive due process." R.B., supra, 158 N.J.Super. at 547, 386 A.2d 893.
After a thorough review of the hearing record, we are convinced that the State has failed to establish by clear and convincing evidence that J.R. presented a danger to himself or others or property as required by N.J.S.A. 30:4-27.15a, thereby requiring a reversal of the order of commitment.

* * * * * *
[At the direction of the court, Points II and III have been omitted from the published version of the opinion.]

* * * * * *
Reversed.
NOTES
[1] The hearing was held on Friday, March 31, 2006. Monday would have been March 27, 2006, four days earlier.
[2] The screening documents are not part of the appellate record. At oral argument, both counsel indicated that neither of them had a copy of the documents.