# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1534-15T2

IN THE MATTER OF THE
COMMITMENT OF S.D.

_____

Submitted February 14, 2017 - Decided  March 16, 2017

Before Judges Koblitz and Rothstadt.

On appeal from a Municipal Court of New
Jersey, Docket No. 15-7115.

Joseph E. Krakora, Public Defender, attorney
for appellant (Rihua Xu, Assistant Deputy
Public Defender, of counsel and on the
brief).

Courtney M. Gaccione, Essex County Counsel,
attorney for respondent (Thomas M. Bachman,
Assistant Essex County Counsel, of counsel
and on the brief).

PER CURIAM

S.D.[1] appeals from an October 21, 2015 municipal court order

of involuntary commitment.[2]  Because    the    County    did    not

_____

[1] Appellant's initials are used to protect his privacy.  R. 1:38-
3(f)(2).

[2] This direct appeal to the Appellate Division  from an order
entered by a municipal court judge is permitted pursuant to

demonstrate by clear and convincing evidence that S.D. was a danger to himself, others or property, we reverse.

S.D. is a thirty-five-year-old man diagnosed with schizophrenia,[3] who has a long history of hospitalizations. A manifestation of S.D.'s symptoms is that he talks aloud to himself, sometimes quite loudly.

On September 23, 2015, S.D. was released from the psychiatric ward of Newark Beth Israel Medical Center (Medical Center) on condition that he take his prescribed medication, reside at the Restoration Center shelter and follow up with the

_____

N.J.S.A. 30:4-27.15, and the definition of "court" contained in N.J.S.A. 30:4-27.2(f), as Superior Court or municipal court.

[3] The mental condition schizophrenia was characterized during the commitment hearing as a disorder in which the individual has "hallucinations, delusions, disorganized behavior, disorganized thought or negative symptoms."

According to the Mayo clinic:

> Schizophrenia is a severe mental disorder in which people interpret reality abnormally. Schizophrenia may result in some combination of hallucinations, delusions, and extremely disordered thinking and behavior that impairs daily functioning, and can be disabling.
>
> Schizophrenia is a chronic condition, requiring lifelong treatment.
>
> [Diseases and Conditions: Schizophrenia, Mayo Clinic (Oct. 11, 2016), http://www.mayoclinic.org/diseases-conditions/schizophrenia/home/ovc-20253194.]

A-1534-15T2

Program of Assertive Community Treatment (PACT). At the end of September, a week after his conditional release, S.D. was sent from Newark Penn Station back to the Medical Center for an emergency screening.

At the commitment hearing, Dr. Sostre, S.D.'s treating psychiatrist at the Medical Center, was qualified as an expert in psychiatry and testified as the only witness for the County. S.D. testified on his own behalf. Dr. Sostre described S.D. as "guarded." He stated that although S.D. denies any auditory or visual hallucinations or "any suicidal or homicidal ideations," "he has been observed to be talking to himself, at times loudly, on the unit." According to Dr. Sostre, this response to internal stimuli indicates that S.D. is "psychotic" with poor insight into his illness.

Dr. Sostre testified that he believed S.D. would be a danger to others if discharged from the hospital and recommended that S.D. be referred to a long-term, inpatient treatment center. Dr. Sostre stated that he based his opinion on:

> S.D.'s history of . . . non-compliance with medications and follow-up, as he's refused to follow up with the PACT team, and his rapid decompensations, as evidenced by the fact that he was discharged just one week prior to this admission to the hospital and he was readmitted because of his threatening and agitative behavior at Penn Station.

On cross-examination, Dr. Sostre admitted that "[t]he reports were vague coming from Penn Station, but [his] understanding [was] that [S.D.] was verbally threatening people at Penn Station." Dr. Sostre also testified that S.D. had never been physically abusive or threatening toward any staff member or patient in the hospital. When asked by defense counsel if on the day in Penn Station it was "possible that [S.D.] was simply being loud, as he's demonstrated in the hospital?" Dr. Sostre replied "possibly."

No testimony was adduced at trial regarding S.D.'s danger to himself except the following.

> [Dr. Sostre]: He's a danger to himself and others -- because he becomes non-compliant with medications and [h]e becomes threating towards other people in the community, specifically Penn Station this last time.

S.D. testified that he did not remember the events of that day, but maintained he did not threaten anyone. He further testified he had never been verbally abusive toward anyone, never intended harm against another individual, and never intended to harm himself. On cross-examination, S.D. claimed that he had filled his prescription upon discharge and was taking his medication. No evidence was given concerning whether the PACT team had an opportunity to contact S.D. during the week he was out of the Medical Center.

After closing statements, and before announcing her findings, the municipal court judge asked S.D. some questions and made the following remarks:

> [The Court]: The problem, [S.D.] and counsel, is that [S.D.] is among the vast sea of humanity that is kind of lost because he is mentally ill, he is psychotic. I'm not saying that he's dangerous to the point where he has actively injured anybody, but we all know the phenomenon of people who are drawn to linger, loiter, hangout in public spaces and especially find Penn Station particularly appealing, and especially with the winter coming.
>
> And I think that the confrontations with commuters comes about in the panhandling context, although there has been not a word of testimony suggesting that. So it could either be soliciting food or money from strangers, which is bothersome, or just talking to them. He admitted that he talks to people. I don't want to suggest that talking to people means that you should be locked up in an institution, but it's the combination [of] factors here.
>
> [S.D.] is an articulate young man. He's 35 years old. He says that he has reported to the Restoration Center and is staying there every night, but why do you have to keep going to Penn Station, [S.D.]? Tell me that.

The judge then asked S.D. what he did to obtain money, to which S.D. responded: "I receive benefits from Social Security." After further discussion on the symptoms of schizophrenia the court characterized S.D.'s testimony.

A-1534-15T2

[The Court]: All right. Well, I understand, [defense counsel's] argument that just because somebody is different, he talks to himself and he wanders around and he — he's not likely to take his meds, that, . . . in and of itself, is not a sufficient reason to commit him. However, this is not speculation when it comes to [S.D.]. He does not take his meds. He is recommitted as regularly as clockwork.

And I find his testimony a mixture of credible and incredible. The incredible part is that he doesn't go to Penn Station every day. I think he goes there with a purpose and his purpose is to preserve his life, get money, get — maybe get food, go in the garbage, whatever people do —

. . . .

Well, sir, I understand your dilemma, but when you come into confrontations with the public, it is a threat to the safety and the good order of the people who are commuting.

The judge went on to make a finding that S.D. was "aggressive and threatening toward commuters at Newark Penn Station." She further found that "even though [S.D.] puts a more benign spin on his talking to people, [the court] find[s] that that's not exactly how he was perceived by others. And that being the case, he is lacking in judgment and insight."

The judge ordered S.D. to be civilly committed "by virtue of his mental illness, dangerous as he is to himself and others." The court ordered that the "doctor's report [be]

amended to add danger to self by virtue of [S.D.'s] provocative behavior."

S.D. was transferred to a long-term locked institution and subsequently discharged.

S.D. raises the following issues on appeal:

> POINT ONE: THE TRIAL COURT ERRED BY INVOLUNTARILY CONFINING S.D. IN A LOCKED PSYCHIATRIC FACILITY AND ORDERING HIM TO BE TRANSFERRED TO A LONG TERM INSTITUTE WITHOUT CLEAR AND CONVINCING EVIDENCE THAT HE PRESENTED A DANGER TO HIMSELF, OTHERS, OR PROPERTY AS REQUIRED BY N.J.S.A. 30:4-27.15(A) AND 30:4-27.2(M).

> POINT TWO: THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT ENTERED A CIVIL COMMITMENT ORDER THAT WAS ROOTED IN A MULTITUDE OF BASELESS SPECULATION DEVOID OF ANY SUPPORTING EVIDENCE OR VALID FACTUAL BASIS TO MERIT A CONTINUATION OF CIVIL COMMITMENT.

> POINT THREE: S.D.'S APPEAL IS NOT MOOT.

"The scope of appellate review of a commitment determination is extremely narrow and should be modified only if the record reveals a clear mistake." In re D.C., 146 N.J. 31, 58 (1996). While the reviewing court should "give[] deference to civil commitment decisions and reverse[] only when there is clear error or mistake," it should also "consider the adequacy of the evidence." In re Commitment of M.M., 384 N.J. Super. 313, 335 (App. Div. 2009).

"Because commitment effects a serious deprivation of liberty, citizens are entitled to 'the meticulous protection of both procedural and substantive due process.'" In re Commitment of J.R., 390 N.J. Super. 523, 533 (App. Div. 2007) (quoting In the Commitment of R.B., 158 N.J. Super. 542, 547 (App. Div. 1978)). Reviewing courts "have not hesitated to reverse involuntary commitments when the record failed to contain clear and convincing evidence of 'a substantial risk of dangerous conduct within the reasonably foreseeable future.'" In re Commitment of T.J., 401 N.J. Super. 111, 119 (App. Div. 2008) (quoting In re S.L., 94 N.J. 128, 138 (1983)).

The provisions of N.J.S.A. 30:4-27.1 to -27.23 and Rule 4:74-7 govern the process of involuntary commitments. For a court to order involuntary commitment, it must find "by clear and convincing evidence":

> that the patient is in need of continued involuntary commitment by reason of the fact that (1) the patient is mentally ill, (2) mental illness causes the patient to be dangerous to self or dangerous to others or property as defined in N.J.S.A. 30:4-27.2(h) and -.2(i), (3) the patient is unwilling to be admitted to a facility for voluntary care, and (4) the patient needs care at a short-term care or psychiatric facility or special psychiatric hospital because other services are not appropriate or available to meet the patient's mental health care needs.
>
> [R. 4:74-7(f)(1).]

Under N.J.S.A. 30:4-27.2(m), a person is "[i]n need of involuntary commitment" when "mental illness causes the person to be dangerous to self or dangerous to others or property[,]" and the person is unwilling to be voluntarily admitted to a facility for care. The burden is on the County to prove "the grounds for commitment by clear and convincing evidence." In re Commitment of J.R., supra, 390 N.J. Super. at 529.

Furthermore, the dangerousness must be "relatively immediate" and "[t]here must be, in fact, a 'substantial risk of dangerous conduct within the reasonably foreseeable future.'" Id. at 530 (first quoting In re Commitment of N.N., 146 N.J. 112, 130 (1996), then quoting In re S.L., supra, 94 N.J. at 138).

According to N.J.S.A. 30:4-27.2(h) "dangerous to self"

> means that by reason of mental illness the person has threatened or attempted suicide or serious bodily harm, or has behaved in such a manner as to indicate that the person is unable to satisfy his need for nourishment, essential medical care or shelter, so that it is probable that substantial bodily injury, serious physical debilitation or death will result within the reasonably foreseeable future.

S.D. maintains that "there is not a single shred of testimony or evidence presented by the [County]" that S.D. cannot care for himself or has threatened or attempted self-harm. The County relies on Dr. Sostre's response to cross-

9

examination that S.D. is "a danger to himself and others . . . because he becomes non-compliant with medications and he becomes threatening towards other people in the community."

Under N.J.S.A. 30:4-27.2(h) danger to self may be established if the patient "is unable to satisfy his need for . . . essential medical care."  However, the record must contain clear and convincing evidence of a substantial risk of dangerous conduct within a foreseeable future.  J.R., supra, 390 N.J. Super. at 530.

In J.R., the court's "finding of dangerousness was based essentially on the judge's belief that if [the patient] fail[ed] to take his medication, he can become agitated and manic." Ibid.  The lower court rationale was that the patient's "behavior could lead to someone assaulting him, which could cause him to be dangerous to himself as well."  Ibid.  We found this "inadequate" to meet the State's burden.  Id. at 531. Likewise, in this case, Dr. Sostre testified that S.D. becomes dangerous to himself "because he becomes non-compliant with medications."

In her findings, the judge stated: "I understand that just because somebody is different, he talks to himself and he wanders around" and is unlikely to continue taking medication, "in and of itself is not a sufficient reasons to commit him."

She committed S.D. nonetheless, because of the frequency of his prior commitments. The judge went on to order, without a request from the County, that the "doctor's report" be amended to "add danger to self by virtue of [S.D.'s] provocative behavior."

N.J.S.A. 30:4-27.2(i) states:

> "Dangerous to others or property" means that by reason of mental illness there is a substantial likelihood that the person will inflict serious bodily harm upon another person or cause serious property damage within the reasonably foreseeable future. This determination shall take into account a person's history, recent behavior and any recent act or threat.
>
> [Emphasis added.]

We have held that in rare instances the statute could be satisfied if the "substantial likelihood of psychological harm to others [was] so severe as to inflict 'serious bodily harm upon another person.'" In re Commitment of A.A., 252 N.J. Super. 170, 179 (App. Div. 1991) (quoting N.J.S.A. 30:4-27.2(i)). Merely characterizing language as "aggressive" is not enough, however, to establish that a "verbal assault" occurred that reached the level of serious bodily harm. J.R., supra, 390 N.J. Super. at 532. In J.R., the patient was accused of making verbally abusive statements to the medical staff; however, no evidence was presented "regarding the nature" of these comments or "the

11

context in which they were made, or even the demeanor and tone used." Id. at 532. We found that this evidence was insufficient to satisfy N.J.S.A. 30:4-27.2(i). Ibid.

Similarly, in In the Commitment of W.H., 324 N.J. Super. 519, 524 (App. Div. 1999), we found the testimony of the appellant's doctor that when the patient does not take his medications he becomes "delusional and talks to himself" insufficient to meet the standard of dangerousness to self or others. Suffering from a mental illness alone is not sufficient for involuntary commitment. S. L., supra, 94 N.J. at 137-38 (citing O'Connor v. Donaldson, 422 U.S. 563, 575-76, 95 S. Ct. 2486, 2493-94, 45 L. Ed. 2d 396, 406-07 (1975)).

Here, no testimony was presented about the content of the comments made at Penn Station. Dr. Sostre himself characterized the reports as "vague" and could not relay them with any specificity. Dr. Sostre acknowledged it was "possible" that S.D. was merely "being loud." Furthermore, when Dr. Sostre testified that S.D. "was threatening other commuters at Penn Station," S.D.'s counsel objected to the testimony as hearsay. The court allowed the comments because the doctor "utilize[d] that screening information for the purposes of diagnosis — only[.]" As the County concedes, "a judge must take care to avoid any use of an expert's testimony about the foundation for

an opinion as proof of facts that are neither derived from nor established by otherwise admissible evidence." M.M., supra, 384 N.J. Super. at 335.

Dr. Sostre admitted on cross-examination that he had never witnessed S.D. verbally abusing anyone at the hospital. Therefore, his evidence that S.D. was dangerous to others was based only on the report from Penn Station and the fact that S.D. responds to verbal stimuli. J.R. requires that verbal threats be more than just generally categorized as "aggressive." J.R., supra, 390 N.J. Super. at 531. Without a finding of dangerousness based on clear and convincing evidence, S.D. should not have been involuntarily committed.

"It is well settled in New Jersey that an appeal in these types of cases is not moot, even if the patient is no longer confined, when the patient remains liable for his or her hospital bill, and a finding in the patient's favor will entitle the patient to a credit for any period of illegal commitment." In re Commitment of B.L., 346 N.J. Super. 285, 292 (App. Div. 2002). Although New Jersey has repealed the automatic lien provisions formerly contained in N.J.S.A. 30:4-80.1, other statutes render patients liable for all or part of the costs of their hospitalization. See N.J.S.A. 30:4-60(c)(1) (establishing liability for cost of treatment, maintenance and all related

expenses for treatment in a psychiatric facility); N.J.S.A. 30:4-70 (requiring payment upon subsequent discovery of patient funds).

Furthermore, "even if appellant had no liability for hospital costs, we 'should nevertheless decide the issue [if] it implicates a committee's constitutional right to liberty. . . .'" T.J., supra, 401 N.J. Super. at 118 (quoting In re Commitment of G.G., 272 N.J. Super. 597, 600 n.1, (App. Div. 1994)). Finally, if the correctness of the challenged commitment affects the nature of future placements the matter should not be considered moot. M.M., supra, 384 N.J. Super. at 322, n.3; see N.J.S.A. 30:4-27.5 ("If a person has been admitted three times or has been an inpatient for 60 days at a short-term care facility during the preceding 12 months, consideration shall be given to not placing the person in a short-term care facility.").

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION