**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3405-15T2

IN THE MATTER OF THE
COMMITMENT OF S.S.

_____

Argued January 26, 2017 — Decided March 22, 2017

Before Judges Hoffman and O'Connor.

On appeal from a Municipal Court of New
Jersey, Docket No. MNCC-1490-15.

Cynthia Seda-Schreiber, Assistant Deputy
Public Defender, argued the cause for
appellant S.S. (Joseph E. Krakora, Public
Defender, attorney; Ms. Seda-Schreiber, on the
briefs).

Jeffrey P. Beekman, Special County Counsel,
argued the cause for respondent Monmouth
County Adjustor (Andrea I. Bazer, Monmouth
County Counsel, attorney; Mr. Beekman, on the
brief).

PER CURIAM

S.S. (Susan)[1] appeals from a March 3, 2016 civil commitment

order that continued her involuntary commitment pursuant to

_____

[1]   We refer to appellant using a pseudonym for ease of reference
and to protect her privacy.

N.J.S.A. 30:4-27.15(a). A municipal court judge[2] entered the order after denying Susan's request to convert to voluntary admission status, finding her incapable "of making the decision knowingly." Susan challenges the court's conclusion, citing her acknowledgement of her need for therapy, her current medications, and one-to-one supervision. She also acknowledged the State would involuntarily recommit her if she declined to comply with her psychiatrist's treatment. We agree with Susan that the record shows she knowingly requested to convert to a voluntary admission. We therefore reverse the court's order renewing her involuntary commitment.

I.

Jersey Shore Medical Center (JSMC) admitted Susan to its psychiatric unit on November 8, 2015. While on the unit, Susan used staples to cut her neck, wrist, and legs, and "required [four] point restraints" and "monitoring for safety." Three days later, a psychiatrist screened Susan for temporary involuntary commitment at JSMC. The psychiatrist affirmed (1) she "personally examined"

---

[2] We discern no error in permitting an appeal directly to this court from an order of involuntary commitment entered by a municipal court judge instead of requiring review by the Law Division in the first instance. The statute authorizing a "court" to commit an individual involuntarily, N.J.S.A. 30:4-27.15, defines the term "court" as meaning "the Superior Court or a municipal court." N.J.S.A. 30:4-27.2(f). It also makes no provision for a de novo review in the Law Division.

Susan, (2) Susan suffered "from a mental illness," (3) Susan, "if not committed, would be a danger to self and/or others or property by reason of mental illness in the foreseeable future," and (4) Susan was "unwilling to be admitted to the required treatment program or facility voluntarily for care." The next day, another psychiatrist screened Susan at Monmouth Medical Center (MMC), and came to the same conclusions.

After an initial hearing on November 24, 2015, a municipal court judge ordered defendant involuntarily committed to a psychiatric facility. Susan was transferred to Trenton Psychiatric Hospital (TPH) the next day. On December 17, 2015, and February 4, 2016, the municipal court reviewed Susan's case and continued her involuntary commitment to TPH.

On March 3, 2016, the municipal court once again reviewed Susan's case. Without previously notifying the court or the State, Susan asked the court to convert her involuntary commitment to a voluntary admission. Her covering psychiatrist then testified. He had started covering her case the previous day; nevertheless, he had reviewed Susan's chart and personally evaluated her. He testified Susan had been admitted to MMC because "she was non-compliant with treatment, including medications." She stated she could not handle herself, and had several visits to the Emergency Room because of cutting herself.

The psychiatrist said Susan's "primary diagnosis" was "bipolar I, although borderline personality disorder is on Axis II." She received dialectical behavior therapy designed to prevent her borderline personality disorder from causing her to harm herself. She was currently taking four prescribed medications.

The psychiatrist testified Susan's mood remained "unstable." She still had "poor impulse control." The day before, she had told the psychiatrist that "she had these staples[,] and she wanted to cut herself." TPH assigned her a "one-to-one" to supervise her at all times. She gave the staples to the "one-to-one." Without the "one-to-one," she may have acted on her desire to cut herself. The psychiatrist therefore concluded Susan was a "danger to herself." He also concluded Susan was "unable to care for herself" because of her "mood disregulation" and instability.

The psychiatrist testified Susan could forego the "one-to-one" when she could reliably regulate her own mood and refrain from harming herself. He said if Susan were on voluntary status and asked TPH to discharge her, the hospital would seek to commit her involuntarily because she was a danger to herself. The psychiatrist consequently recommended "continued commitment and four-month review."

On cross-examination, the psychiatrist admitted Susan knew where she was, to whom she spoke, and the approximate date. Her

A-3405-15T2

"thought process" was "not disorganized." She did not have "auditory or visual hallucination[s]." Although she had reported her desire to harm herself the day before, she had "cut herself without telling the staff" in the past.

Susan testified next. She recognized she was at TPH. She said she was cooperatively undergoing dialectical behavior therapy. She admitted she needed the therapy. She said she had been taking her medications, but she said "they're not [the] right medications." She expressed this opinion to the psychiatrist who examined her the day before, but he told her that she had to wait until her regular psychiatrist returned. She admitted she had "racing thoughts." "I'll just be honest, yesterday I was close to suicide." "I mean, sitting here now I can see a bunch of staples that I could pick up and use, but I'm not going to." She said she wanted to continue as a voluntary patient, and she would not refuse medication. She understood that TPH would seek to recommit her involuntarily if she declined to follow her psychiatrist's prescribed treatment. She said she was responsible enough to be a voluntary patient.

The court denied her request and continued her involuntary commitment. Initially, the court emphasized its concern for Susan's safety. The court, however, relied on "the opinion of . . . the doctor who's examined her, and the doctor pretty much

unequivocally says that she does not believe that the patient has the capability to give the consent to dictate the terms of her own treatment."

In its brief, the State discusses testimony from the next review hearing, without moving to supplement the record, R. 2:5-5, and without providing a transcript of the hearing. R. 2:5-4(a). Because of these deficiencies, we decline to discuss the subsequent hearing further. Additionally, because this case presents a narrow issue regarding Susan's request to convert to voluntary admission status on a particular date, we do not find the subsequent hearing relevant to the decision under review.

## II.

We review the decision to continue an individual's civil commitment utilizing an abuse of discretion standard. See In re D.C., 146 N.J. 31, 58-59 (1996). When reviewing civil commitment decisions, "we afford deference to the trial court's supportable findings." In re Commitment of T.J., 401 N.J. Super. 111, 119 (App. Div. 2008) (citation omitted). We "reverse[] only when there is clear error or mistake." In re Commitment of M.M., 384 N.J. Super. 313, 334 (App. Div. 2006) (citations omitted). However, we "must consider the adequacy of the evidence." Ibid. (citations omitted).

N.J.S.A. 30:4-27.15a authorizes a court to continue an individual's involuntary commitment past a temporary commitment order, so long as "the court finds by clear and convincing evidence that the patient needs continued involuntary commitment." The statute defines "in need of involuntary commitment to treatment" as "an adult with mental illness, whose mental illness causes the person to be dangerous to self or dangerous to others or property and who is unwilling to accept appropriate treatment voluntarily after it has been offered." N.J.S.A. 30:4-27.2(m). The Legislature further defined the purpose of the statute as requiring commitment only when an individual is "dangerous to [herself], others or property." N.J.S.A. 30:4-27.1(a). When a person is no longer dangerous by reason of mental illness, however, and they can be supported by themselves or by family members, they must be released. See In re Commitment of M.C., 385 N.J. Super. 151, 159 (App. Div. 2006) (citing O'Connor v. Donaldson, 422 U.S. 563, 576, 95 S. Ct. 2486, 2494, 45 L. Ed. 2d 396, 407 (1975)).

"Dangerous to self" is defined as:

> [B]y reason of mental illness the person has threatened or attempted suicide or serious bodily harm, or has behaved in such a manner as to indicate that the person is unable to satisfy his need for nourishment, essential medical care or shelter, so that it is probable that substantial bodily injury, serious physical harm or death will result within the reasonably foreseeable future; however, no person shall be deemed to be

7

unable to satisfy his need for nourishment, essential medical care or shelter if he is able to satisfy such needs with the supervision and assistance of others who are willing and available. This determination shall take into account a person's history, recent behavior and any recent act, threat or serious psychiatric deterioration.

[N.J.S.A. 30:4-27.2(h).]

An application to commit a person involuntarily or to continue such a commitment must be based on a finding

by clear and convincing evidence . . . that the patient is in need of continued involuntary commitment by reason of the fact that (1) the patient is mentally ill, (2) mental illness causes the patient to be dangerous to self . . . , (3) the patient is unwilling to be admitted to a facility for voluntary care, and (4) the patient needs . . . care at a short-term care or psychiatric facility or special psychiatric hospital because other services are not appropriate or available to meet the patient's mental health care needs.

[R. 4:74-7(f)(1).]

Involuntary civil commitment must also be based on more than "the potential for dangerous conduct." In re Commitment of J.R., 390 N.J. Super. 523, 530 (App. Div. 2007).

"Voluntary admission" means

that an adult with mental illness, whose mental illness causes the person to be dangerous to self or dangerous to others or property and is willing to be admitted to a facility voluntarily for care, needs care at a short-term care or psychiatric facility because other facilities or services are not

8

> appropriate or available to meet the person's
> mental health needs.
>
> [N.J.S.A. 30:4-27.2(ee).]

When a patient has been involuntarily committed to a psychiatric facility, and the patient motions the municipal court to convert the commitment to voluntary status, "the court shall hold a hearing within 20 days to determine whether the patient had the capacity to make an informed decision to convert to voluntary status and whether the decision was made knowingly and voluntarily." R. 4:74-7(g)(1). "Knowing" means "[h]aving or showing awareness or understanding." Black's Law Dictionary 950 (9th ed. 2009).

Susan argues her "orientation and lack of thought disorganization tends to show that she had the capacity for a knowing and voluntary application for voluntary status," and "[c]ompliance and asking for help indicate insight and also illustrate capacity for a knowing and voluntary request for voluntary conversion." The record supports Susan's argument. It shows she understood her surroundings and her need for dialectical behavior therapy and one-to-one supervision. She was taking her prescribed medicine, even though she wanted her psychiatrist to reconsider certain medication because her thoughts were racing, and she felt acutely suicidal. She expressed these feelings, so her doctors and the court could help her get better. She did not

9

dispute she needed one-to-one supervision. She understood TPH would recommit her involuntarily if she decided not to comply with her psychiatrist's prescribed treatment.

Notwithstanding Susan's acknowledgment of her condition and her need for treatment, the testifying psychiatrist nevertheless concluded Susan should remain involuntarily committed to TPH. He reasoned that Susan still desired to harm herself, she had "poor impulse control," and she needed one-to-one supervision.

The testimony of the testifying psychiatrist does not support the court's decision to renew Susan's involuntary commitment to TPH. Both parties agree Susan required psychiatric care for the mental illness that causes her desire to harm herself, as Rule 4:74-7(f) requires. The record, however, does not show Susan was "unwilling to be admitted to a facility for voluntary care." Ibid. The record shows Susan understood she needed to comply with her psychiatrist's prescribed treatment, and the consequences of not complying. The record further shows Susan knowingly and voluntarily asked the court to convert her from involuntary commitment to a voluntary admission. We conclude the judge's determination here to continue Susan's involuntary commitment was not supported by clear and convincing evidence. We therefore reverse the municipal court.

The State argues it needed advance notice of Susan's request for voluntary admission in order "to adequately prepare its case for a fair and meaningful hearing relative to capacity and the determination whether the patient made the conversion request knowingly and voluntarily." The State never made this argument at the hearing; the State did not request an adjournment or argue that lack of notice precluded a proper hearing. We discern no basis for considering this argument here. "[O]ur appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest." State v. Robinson, 200 N.J. 1, 20 (2009) (quoting Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973)).

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION